TRUSTEES OF the GRACELAND
CEMETERY IMPROVEMENT
FUND

v.

The UNITED STATES.

TRUSTEES OF the GRACELAND
CEMETERY IMPROVEMENT FUND,
*qua* Trustees of the Graceland Cemetery Improvement Fund—General Fund

v.

The UNITED STATES.

TRUSTEES OF the GRACELAND
CEMETERY IMPROVEMENT FUND,
*qua* Trustees of the Graceland Cemetery Improvement Fund—Lot Owners' Fund

v.

The UNITED STATES.

TRUSTEES OF the GRACELAND
CEMETERY IMPROVEMENT FUND,
*qua* Trustees of the Graceland Cemetery Improvement Fund—Marshall Field Fund

v.

The UNITED STATES.

Nos. 446–69—449–69.

United States Court of Claims.

April 16, 1975.

As Amended on Denial of Rehearing
and Rehearing En Banc
May 30, 1975.

Sharon L. King, Chicago, Ill., attorney of record for plaintiff. Walter J. Hartmann, Robert W. Kleinman and Isham, Lincoln & Beale, Chicago, Ill., of counsel.

Patricia B. Tucker, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant. Theodore D. Peyser and Donald H. Olson, Washington, D. C., of counsel.

Before SKELTON, NICHOLS and BENNETT, Judges.

## OPINION

SKELTON, Judge.

This case is the consolidation of four closely related causes of action all seeking a refund of federal income taxes for the tax years ending April 30, 1962, 1963, 1964, and 1965. It comes before us under stipulation of facts for determination of the plaintiffs' right to recover taxes allegedly overpaid, reserving the question of quantum for further proceedings. Three of the four plaintiffs represent "trust" entities created by the Internal Revenue Service for the purpose of assessing tax during the years in question. For protective purposes only, the principal plaintiff, the Trustees of Graceland Cemetery Improvement Fund (hereinafter referred to as plaintiff or Improvement Fund), filed petitions in the names of these IRS defined entities, although it continues to maintain that these "trusts" do not exist and therefore should not be taxed. The necessary facts stipulated to by the parties are incorporated in our opinion below.

The Improvement Fund was organized and incorporated by a special act of the Illinois legislature, approved February 16, 1865. It was established as a non-share-holding special charter Illinois corporation whose principal purpose is the perpetual care and maintenance of the Graceland Cemetery located in Chicago, Illinois. Membership in the corporation arises by virtue of ownership of a lot in the Graceland Cemetery; each member is entitled to one vote at meetings called pursuant to the Act of Incorporation to fill vacancies on the Board of Trustees of the Graceland Cemetery Improvement Fund. This elected Board has at all times served without salary or other compensation and has been vested with

the management of the Improvement Fund.

The Graceline Cemetery Company (hereinafter Cemetery Company or Company), incorporated separately from the Improvement Fund, is a special charter Illinois corporation created February 22, 1861, by act of the Illinois legislature. The Cemetery Company is a stockholding corporation which, since its inception, has operated the Graceland Cemetery for profit. In addition to selling burial lots and providing interment services, the Cemetery Company operates a crematory and sells space for the temporary and permanent storage of cremated remains. No officer, director, or shareholder of the Cemetery Company has ever served as a member of the Board of Trustees of the Improvement Fund. Moreover, the Improvement Fund and the Cemetery Company each has its own office and all bank accounts, financial records or other books are kept separate.

In accordance with Section 1 of the Improvement Fund's Act of Incorporation of 1865, the Cemetery Company is obligated to pay over to the Improvement Fund ten percent of the proceeds from the initial sale by the Cemetery Company of lots in the Graceland Cemetery. Under the Act of Incorporation these revenues are to be designated as a permanent fund of at least $50,000. The investment income from this fund and any amounts in excess of $50,000 are committed to the perpetual preservation and improvement of the grounds and structures of Graceland Cemetery.

In addition to the income representing ten percent of the sale of lots, the Improvement Fund is authorized by Section 9 of the Act of Incorporation to receive funds through grants, bequests, or donations for the improvement and care of particular lots. Such funds are to be expended for uses consistent with the purpose of perpetual maintenance and in accordance with specific terms of the original grant.

For each tax year since 1943 including the tax years in question here, the plaintiff filed a single corporate income tax return in the name "Trustees of the Graceland Cemetery Improvement Fund." In its returns the Improvement Fund reported as income the amounts received from the Cemetery Company representing ten percent of the proceeds of lot sales plus the income and gains and losses from the investments made. The amounts received from lot owners under Section 9 for specific care, however, were not included as income. In addition, plaintiff (1) claimed the 85 percent investment dividends received deduction available to corporations under section 243(a)(1) of the Internal Revenue Code of 1954, (2) deducted depreciation on capital improvements made on property owned by it, and (3) deducted payments made for cemetery maintenance expenses and care of lot expenses.

Upon audit, the Internal Revenue Service determined that the income reported by the plaintiff was actually received by and taxable to three different "trusts" defined by the Service: (1) "The Trustees of the Graceland Cemetery Improvement Fund—General Fund" (hereinafter, General Fund), constituting a trust allegedly created for the investment of the ten percent proceeds from lot sales received from the Cemetery Company, (2) "The Trustees of the Graceland Cemetery Improvement Fund—Marshall Field Fund" (hereinafter, Marshall Field Fund), a representative trust created as a result of contributions made under Section 9 for the special care of the Marshall Field lot (the IRS considered each contribution made under Section 9 for the care of a particular lot to constitute a separate taxable trust, but chose the Marshall Field lot, being the largest, for purposes of testing the new tax theory) and, (3) "The Trustees of the Graceland Cemetery Improvement Fund—Lot Owners' Fund" (hereinafter, Lot Owners' Fund), constituting an association of all trusts created by contributions and bequests made under Section 9, such as the Marshall Field Fund, and taxable as a corporation.

In determining the deficiencies to be charged to each of these allegedly taxable entities the IRS denied the three trusts deductions for depreciation, cemetery maintenance, or the cost of care of individual lots. Moreover, the General Fund being a trust was not allowed to claim the corporate dividend received deduction. In determining the taxable income to the Marshall Field Fund, the IRS taxed this trust on income received in the form of a pro rata dividend from the Lot Owners' Fund. The deficiencies assessed were:

## GENERAL FUND

| For the Year Ended April 30 | Assessed Deficiency | Assessed Interest | Total |
|---|---|---|---|
| 1962 | $38, 773. 06 | $14, 171. 29 | $52, 944. 35 |
| 1963 | 46, 595. 06 | 14, 234. 47 | 60, 829. 53 |
| 1964 | 38, 359. 92 | 9, 417. 10 | 47, 777. 02 |
| 1965 | 58, 095. 16 | 10, 776. 23 | 68, 871. 39 |
| | $181, 823. 20 | $48, 599. 09 | $230, 422. 29 |

## MARSHALL FIELD FUND

| For the Year Ended April 30 | Assessed Deficiency | Assessed Interest | Total |
|---|---|---|---|
| 1962 | $382. 99 | $139. 98 | $522. 97 |
| 1963 | 280. 67 | 85. 74 | 366. 41 |
| 1964 | 452. 61 | 111. 11 | 563. 72 |
| 1965 | 334. 55 | 62. 06 | 396. 61 |
| | $1, 450. 82 | $398. 89 | $1, 849. 71 |

## LOT OWNERS' FUND

| For the Year Ended April 30 | Assessed Deficiency | Assessed Interest | Total |
|---|---|---|---|
| 1962 | $37, 380. 91 | $14, 015. 28 | $51, 396. 19 |
| 1963 | 29, 345. 31 | 9, 241. 76 | 38, 587. 07 |
| 1964 | 38, 341. 15 | 9, 774. 37 | 48, 115. 52 |
| 1965 | 32, 017. 09 | 6, 241. 14 | 38, 258. 23 |
| | $137, 084. 46 | $39, 272. 55 | $176, 357. 01 |

For protective purposes the IRS assessed a deficiency against the Trustees of Graceland Cemetery Improvement Fund on the basis of a denial of the plaintiff's deductions for maintenance costs and depreciation. This deficiency totaled:

| For the Year Ended April 30 | Assessed Deficiency | Assessed Interest | Total |
|---|---|---|---|
| 1962 | $30, 564. 40 | $9, 886. 12 | $40, 450. 52 |
| 1963 | 31, 812. 48 | 8, 381. 06 | 40, 193. 54 |
| 1964 | 33, 782. 34 | 6, 873. 09 | 40, 655. 43 |
| 1965 | 35, 378. 92 | 5, 075. 18 | 40, 454. 10 |
| | $131, 538. 14 | $30, 215. 45 | $161, 753. 59 |

On September 30, 1968, all of the foregoing asserted tax deficiencies and interest, totaling $570,382.60 were paid by plaintiff. Thereafter, plaintiff's claim for refund was disallowed by the District Director and this suit was timely filed.

In addition to claiming a refund on these tax deficiencies assessed and paid, plaintiff claimed that it was a tax exempt cemetery company under section 501(c)(13) of the Internal Revenue Code of 1954 and therefore it was entitled to a refund of all taxes paid by it during the years in question as follows:

| *Year Ending April 30* | *Amount of Tax Paid* |
|---|---|
| 1962 | $24,440.44 |
| 1963 | 22,196.75 |
| 1964 | 18,264.95 |
| 1965 | 29,451.59 |
| | $94,353.73 |

It must be noted that because the deficiency assessed against the Improvement Fund by the IRS was for protective purposes only in case this court finds that the three "trust" entities are not the real taxable parties, the plaintiff has been forced to pay a double taxation. For this reason, regardless of what conclusion we reach here, the plaintiff is entitled to some refund, either the deficiency charged to the Improvement Fund, or the tax deficiency charged to the three "trusts."

There are three basic issues that must be resolved in deciding the plaintiff's right to recover a refund. First, it must be determined whether a perpetual care fund, such as the Improvement Fund, operating in connection with a profit-making cemetery is entitled to a tax exemption under section 501(c)(13) of the Internal Revenue Code of 1954. Second, if it is found that the Improvement Fund is not a tax exempt company, we must decide what are the taxable entities here, the Improvement Fund or the "trusts." Third, if the plaintiff is to be taxed not as a trust but as a corporation as it alleges it should, it must be determined whether it should be allowed to take a deduction for the costs of cemetery maintenance and for depreciation on improvements to its capital structures.

## I—*Tax Exempt Cemetery Companies*

Section 501(a) of the Internal Revenue Code of 1954 exempts from tax certain types of organizations including cemetery companies as defined in section 501(c)(13):

(13) Cemetery companies owned and operated exclusively for the benefit of their members or which are not operated for profit; and any corporation chartered solely for burial purposes as a cemetery corporation and not permitted by its charter to engage in any business not necessarily incident to that purpose, no part of the net earnings of which inures to the benefit of any private shareholder or individual. (26 U.S.C. § 501(c)(13) (1964))

Whether the plaintiff here qualifies as such a company depends on the particular functions performed by it as well as its relationship with the non-tax exempt, profit-making Graceland Cemetery Company. We must first look at the particular facts involved in the instant case.

The general maintenance and care required for the common areas of the Graceland Cemetery has always been provided by the Cemetery Company. Since an agreement signed on July 1, 1935, by the plaintiff and the Cemetery Company, the Cemetery Company has received from the Improvement Fund $12,000 a year in equal monthly install-

ments for this general maintenance work. These funds presumably come from the income earned through the investment of the ten percent received by the plaintiff on the initial sale of cemetery lots. Despite this payment, the Cemetery Company has had to expend out of its own revenues well in excess of $12,000 to cover the costs of the upkeep of the common areas. In fact, the stipulated facts indicate that the Company spent on the average more than $27,000 per year for labor alone associated with maintaining the cemetery's walks, roads, and other public areas.

Aside from the common areas which are maintained out of a percentage of the sale price, when a person purchases a lot in the Graceland Cemetery, he is told that he is responsible for his own care of it. Thus, an owner may provide on his own for mowing, watering, the placing of wreaths or other services specifically desired for his own lot, or he may request the Cemetery Company to perform these services and bill him yearly for it. Although these bills require that "payment must be made before work is done," the Cemetery Company voluntarily performs those services necessary to preserve the general appearance of the cemetery regardless of whether payment is actually made.

Periodically, lot owners are informed by the Cemetery Company, at the request of the Improvement Fund, that they may be relieved of their yearly maintenance bill for individual care by setting up a permanent care fund with the plaintiff. Such a payment made to the Improvement Fund under Section 9 of its Act of Incorporation results in care being maintained in perpetuity.

Although some owners have provided their own care and maintenance, the Cemetery Company has primarily performed all of the maintenance on grave sites, except for mausoleum repair, either by being hired directly by the owners or being hired by the Improvement Fund to take care of those lots for which Section 9 funds have been received. However, just as the Cemetery Company performed those services necessary to maintain the general appearance of grave lots whether or not the particular owner actually paid his yearly bills, until 1963 the company did not even bill the Improvement Fund for care of lots for which plaintiff received funds under Section 9. All mowing and watering on individual lots was provided by the Cemetery Company as a matter of pride as well as part of its sales policy.

The plaintiff, beyond merely paying the bills for the work done on lots having a perpetual care fund also periodically visited the cemetery to determine what extra work was needed. All bills it received for work done on an individual lot was charged to the particular Section 9 fund established for that lot.

Unlike the Cemetery Company which has always operated for a profit and has never been considered tax exempt, the Improvement Fund now claims that because it is a nonprofit, nonshareholding company it should be considered eligible for a section 501(c)(13) exemption. Under this section three mutually independent requirements for a cemetery company to qualify for a tax exemption are: (1) it must be owned and operated exclusively for the benefit of its members, (2) it must not be operated for profit, or, (3) it must be a cemetery corporation chartered solely for burial purposes, not permitted by its charter to engage in activities not incident to those purposes and no part of its net earnings inure to an individual or shareholder. If the plaintiff is a cemetery company and meets any one of the three requirements, it will be exempt. The issue becomes whether a perpetual care organization, such as the Improvement Fund, which is operated in connection with a profit-making cemetery, is a cemetery company and is within one of the three alternative categories of section 501(c)(13).

Although this is a question of first impression in this court, other federal courts have dealt with the issue. *See* Evergreen Cemetery Association of Seattle v. United States, 444 F.2d 1232 (9th

Cir. 1971), cert. denied, sub nom. Washington Trust Bank v. United States, 404 U.S. 1059, 92 S.Ct. 739, 30 L.Ed.2d 747 (1972); Washington Trust Bank v. United States, 444 F.2d 1235 (9th Cir. 1971), cert. denied, 404 U.S. 1059, 92 S.Ct. 739, 30 L.Ed.2d 747 (1972); Mercantile Bank & Trust Co. v. United States, 441 F.2d 364 (8th Cir. 1971); Evergreen Cemetery Ass'n. v. United States, 375 F.Supp. 166 (W.D.Ky.1974); Provident National Bank v. United States, 325 F.Supp. 1187 (E.D. Pa.1971); Arlington Memorial Park Ass'n. v. United States, 327 F.Supp. 344 (W.D.Ark.1971); Rosehill Cemetery Co. v. United States, 285 F.Supp. 21 (N.D.Ill. 1968); First National Bank of Waco v. United States, 327 F.Supp. 1119 (W.D. Tex.1970); Denver United States National Bank v. United States, 302 F.Supp. 801 (D.Colo.1965); Resthaven Memorial Park & Cemetery Ass'n. v. United States, 155 F.Supp. 539 (W.D.Ky. 1957).

With the exception of *Denver United States National Bank, supra,* and *Resthaven Memorial Park Cemetery Ass'n., supra,* the courts found in each case that the nonprofit perpetual care fund organization did not qualify for a tax exemption when associated with a profit-making cemetery corporation. The reasons for the denial of an exemption, however, were not uniform. In several cases the federal courts decided that a perpetual care organization whose only function is the providing of funds for a profit-making cemetery company and which does not own its own cemetery land nor perform burials or provide care and maintenance, cannot qualify as a "cemetery company" as the term is used in section 501(c)(13). *See* Mercantile Bank & Trust Co. v. United States, *supra*; Evergreen Cemetery Ass'n. v. United States, 375 F.Supp. 166 (W.D.Ky.1974); Evergreen Cemetery Association of Seattle v. United States, *supra.* In *Rosehill Cemetery Co., supra,* the district court looked to prevailing revenue rulings to decide that the perpetual care fund organization was so closely connected with a profit-making cemetery company that it takes on

its taxable status. Using a similar type of analysis, the court in *First National Bank of Waco, supra,* decided that where the perpetual care fund merely provided funds to help defray the costs for which the profit-making cemetery was obligated, it must be considered a functional part of the taxable cemetery company.

Exemptions from federal income tax have always been strictly construed. Bingler v. Johnson, 394 U.S. 741, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969); Commissioner v. Jacobson, 336 U.S. 28, 49, 69 S.Ct. 358, 93 L.Ed. 477 (1949); Mercantile Bank & Trust Co. v. United States, *supra.* Given the factual context of the instant case and the long line of precedents denying tax exemptions for nonprofit organizations providing perpetual care funds for a profit-making cemetery company, we believe, for the reasons hereinafter discussed, that the Improvement Fund is not tax exempt under section 501(c)(13).

This court has held in the past that where one organization provides a service which is necessary and indispensable to the operations of another, the first will take on the tax status of the second. Hospital Bureau of Standards & Supplies, Inc. v. United States, 158 F.Supp. 560, 141 Ct.Cl. 91 (1958). In that case the plaintiff was an organization that purchased medical supplies in bulk for its tax exempt member hospitals thereby providing a savings in cost that could not be achieved by the individual hospitals. As a result, the plaintiff was granted the same tax exempt status as its member hospitals. There we held:

> Unquestionably the technical analysis and purchase of hospital supplies from suppliers are necessary and indispensable to the operations of the plaintiff's member hospitals. * * * Where the taxpayer is engaged in a business enterprise that bears a close and intimate relationship to the functioning of a tax-exempt educational institution, it has been held that the taxpayer is entitled to an exemption as an educational institution within the meaning of section 101(6) of the

Internal Revenue Code of 1939. Squire v. Students Book Corporation [9 Cir.], 191 F.2d 1018. * * * [Id, 158 F.Supp. at 562, 141 Ct.Cl. at 94.]

In Squire v. Students Book Corp., 191 F.2d 1018 (9th Cir. 1951), the court granted an exemption to a corporation which ran a bookstore and restaurant on the campus of a tax exempt state college, stating: "The business enterprise in which taxpayer is engaged obviously bears a close and intimate relationship to the functioning of the College itself." [Id. at 1020. See also Produce Exchange Stock Clearing Ass'n v. Helvering, 71 F.2d 142 (2d Cir. 1934). In the latter case a tax exemption was denied a non-profit-making service organization which performed necessary services which would ordinarily be performed by a profit-making business. The Second Circuit noted:

* * * The petitioner is merely an adjunct to the business of the Produce Exchange. Had the latter extended its own services to include [that which was provided by the petitioner] * * it would clearly have remained a non-exempt stock exchange. The statute could never have contemplated that by creating a subsidiary corporation to furnish such facilities, even though they were intended to be performed at cost, it could obtain tax exemption for its creature. * * * [Id. at 143.]

■ These cases clearly indicate that where one organization serves as a mere adjunct for a primary organization by providing services which are essential to the functioning of the primary organization and which would be normally performed by it, the adjunct will acquire the tax status of the primary company. This adjunct theory has been applied to cemetery companies by the Internal Revenue Service in Rev.Rul. 58–190, 1958–1 Cum.Bull. 15 and Rev.Rul. 64–217, 1964–2 Cum.Bull. 153.

Rev.Rul. 58–190, supra, deals with an organization formed to receive perpetual care funds for a nonprofit-making cemetery. Despite the fact that the perpetual care organization did not own land nor perform any services other than receiving and administering funds for the perpetual care of the cemetery, the IRS granted it a section 501(c)(13) tax exemption. The rationale given by the IRS was that " * * * it performs a service essential to the maintenance of a cemetery * * *." [Id. at 17.] This revenue ruling was clarified in a later ruling, Rev.Rul. 64–217, supra:

* * * Implicit in [Rev.Rul. 58–190] * * * is a recognition that the perpetual care funds are providing an essential part of the functions of the cemetery companies themselves. They are thus so closely connected with the actual cemetery companies that they partake of the character of the cemetery companies for exemption purposes. * * * [Id. at 154.]

In Rev.Rul. 64–217 an exemption was sought for a perpetual care trust that was set up by a profit-making cemetery company. The income from the invested funds representing ten percent of the sale of cemetery lots was required to be turned over to the cemetery company for maintenance and care. The IRS denied the exemption because it viewed the trust as being only an adjunct of the nonexempt profit-making cemetery company and therefore should take on the nonexempt nature of the cemetery company.

The Rev. Ruling provided:

* * * Where the company actually operating the cemetery is itself a profit-making enterprise, the perpetual care fund operated in connection with it would also partake of this character and would not be entitled to exemption from Federal income tax. * * [Id. at 154.]

■ In a similar way, the facts in the instant case and discussed above, point toward a finding here that the Improvement Fund must be considered an adjunct of the Graceland Cemetery Company for purposes of tax exemptions. The Cemetery Company had the sole responsibility for the actual running of the

cemetery. Moreover, it had shown in a number of ways that it would provide at least those services believed needed to preserve the cemetery's general appearance regardless of what the plaintiff did or whether plaintiff or private lot owners reimbursed it for its costs. As seen, the stipulated facts show that the Cemetery Company handled the excess costs over the $12,000 paid by the plaintiff to maintain the common areas. Also, the Cemetery Company, at least up until 1963, never billed the plaintiff for individual care on lots for which a Section 9 fund had been created by its owner.

On the other hand, besides supervising the requested care for lots under Section 9, the plaintiff's primary function was providing funds for the Cemetery Company's activities in maintaining the cemetery, which the Company would have paid for out of its own revenue in any case; thus the plaintiff must be considered an adjunct organization as the term is used in Rev.Rul. 64–217, *supra,* and the plaintiff must acquire the Cemetery Company's taxable status. *See* Rev. Rul. 64–217, *supra* ; *Hospital Bureau of Standards & Supplies, Inc., supra.*

As was stated in Rosehill Cemetery Co. v. United States, *supra,* it takes more than the limited activity of providing funds to run a cemetery to make a company a tax exempt "cemetery company":

> * * * But merely because a legal entity performs a cemetery function [such as the commitment of income for the perpetual care of a cemetery] and because it does not itself operate at a profit, it cannot be assumed to be an entity described by Congress as a "cemetery company * * * operated not for profit" and hence exempt from taxation. The most that can be said for this kind of perpetual care fund is that it *"provides an essential part of the functions of the cemetery companies themselves."* * * * [Emphasis supplied.] [285 F.Supp. at 24.]

The court further declared that such an adjunct must be taxed as is its cemetery company:

> * * * Where a fund is an adjunct to a nonprofit cemetery association, it is both logical and reasonable to attribute to it the exempt status of that association, but where, as here, such a fund is closely connected with a profit-making enterprise, there is no ground in logic or reason for allowing it an exemption from federal income taxation. [*Id.* at 25.]

The absence of any legal or contractual obligation on the part of the Cemetery Company to provide care and maintenance for the Graceland Cemetery should not in any way prevent us from finding the plaintiff to be an adjunct of the company. It is enough that the Cemetery Company has historically taken it upon itself to maintain the general appearance of the cemetery. We cannot help but note that to the extent the cemetery is kept in a neat and attractive condition the profit-making Cemetery Company will find it that much easier to sell lots in the future or to induce local funeral directors to recommend the cemetery for interment. Nor do we feel it makes any difference to our consideration whether plaintiff is a trust or a corporation. *See* Washington Trust Bank v. United States, 444 F.2d 1235 (9th Cir. 1971), cert. denied, 404 U.S. 1059, 92 S.Ct. 739, 30 L.Ed.2d 747 (1972).

Besides being ineligible as an adjunct of a profit-making cemetery company, the fact that funds paid to the Cemetery Company inured to the advantage of the Company should further prevent the plaintiff from claiming a section 501(c)(13) exemption. To the extent the plaintiff's financial support of the Cemetery Company assisted it in pursuing its sales policy, the shareholders of the profit-making company benefited. This type of benefit was recognized in Rev.Rul. 64–217, *supra,* where a perpetual care fund was declared an adjunct and denied an exemption as follows:

> * * * Furthermore, as the services and facilities furnished by a perpetual care fund to a cemetery operated for profit constitute substantial assistance in its business by affecting the salabil-

ity and selling price of lots, and relieving the company itself of a legal or contractual obligation, net earnings of such funds inure to the benefit of the profit company or its shareholders. * * * [1964–2 Cum.Bull. at 154.]

For all of the above reasons we hold that the plaintiff is not a tax exempt cemetery company within the definition of section 501(c)(13). We must emphasize that in finding the plaintiff to be an adjunct of the Cemetery Company for tax purposes, we are not saying that the two organizations represent a single entity. *Cf.* Evergreen Cemetery Association of Seattle v. United States, *supra.* We recognize that the two enterprises are run as completely independent enterprises with no commingling of funds or corporate officers. We hold instead, that they are so sufficiently related functionally that the plaintiff acquires the tax status of the profit-making company to which it furnishes assistance of an essential nature.

## II—*Allocation of Income*

In assessing back taxes, the IRS allocated all of the income originally reported by the Improvement Fund to each of three trusts defined by the Service and allegedly representing the true taxable entities. As described earlier, the three trusts defined by the IRS included: (1) the General Fund, representing a trust formed from a percentage of the proceeds from lot sales paid to the plaintiff by the Cemetery Company, (2) the Marshall Field Fund, a trust created from a contribution for individual care of a grave site made under Section 9, and (3) the Lot Owners' Fund, an association of all trusts created by Section 9 contributions and taxed as a corporation.

Although the IRS is seeking to treat the Improvement Fund in this instant case as a group of trusts, it is clear from past federal cases that in general a perpetual care organization such as the plaintiff, may either take the form of a trust, *see* Mercantile Bank & Trust Co. v. United States, 441 F.2d 364 (8th Cir. 1971); First National Bank of Waco v.

United States, 327 F.Supp. 1119 (W.D. Tex.1970); or it may take the form of a corporation. *See* Evergreen Cemetery Association of Seattle v. United States, 302 F.Supp. 720 (W.D.Wash.1969), aff'd 444 F.2d 1232 (9th Cir. 1971). The form that the perpetual care fund takes is significant for the purpose of federal income tax. Thus, if the instant plaintiff is deemed to be a trust, it would be denied the corporate income tax rate as well as the 85 percent deduction allowed on dividends received from other domestic corporations under section 243(a) of the Internal Revenue Code of 1954.

The government admits in its brief that at least since 1943 the plaintiff has filed corporate returns in which the income in question was not considered to be allocated to any trust entities. However, it points out that the treatment of perpetual care funds is a developing area of the law and that this is a test case of its new theory.

### A—*The General Fund*

Section 1 of the plaintiff's Act of Incorporation states:

> Be it enacted by the people of the State of Illinois, represented in the General Assembly, that the Board of Managers of said Graceland Cemetery Company are hereby authorized and required, out of the proceeds of all lots sold * * * to set apart ten per cent thereof as a reserve fund, to be from time to time paid over to the Treasurer of the Board of Trustees hereinafter named and to be kept and used by them as hereinafter provided.

The income from this reserve fund is required by Section 8 of the Act of Incorporation to be used "in the improvement ornamentation, preservation, and maintenance of the grounds, walks, shrubberies, enclosures, structures, monuments, and memorials * * *." These funds were deposited for bookkeeping purposes into an account termed "General Fund" which included all corporate assets of the plaintiff not reflected elsewhere. This account is

charged with all administrative expenses such as office costs, salaries, management, custodial, legal and auditing fees plus federal income tax. That portion of this account which reflects the ten percent of lot sales was allegedly one of the trusts the IRS sought to recognize.

■ It is fundamental trust law that the existence of a trust depends on what the parties said and intended. Oak Woods Cemetery Ass'n. v. United States, 345 F.2d 361 (7th Cir. 1965). An express trust is formed only if the settlor properly manifests an intention to create a trust. It is insufficient that his intention is secretly expressed; there must be some outward manifestation of his intention. Del Drago v. Commissioner, 214 F.2d 478 (2d Cir. 1954); I Bogert, Trusts and Trustees § 45 (2d ed. 1965); I Scott, Trusts § 23 (3d ed. 1967); Restatement (Second) of Trusts § 23 (1959). It is clear here that there was no intent shown on the part of either the lot owners or the Cemetery Company to create a trust with the percentage of the proceeds from lot sales. No agreement, either written or oral, was present between the parties to evidence the requisite intent to create a trust.

■ The government points to language in the Act of Incorporation to show an intent by the Illinois legislature to create a trust. Specifically it notes that Section 4 permits the trustees of plaintiff to adopt such regulations as will be needful for the proper management of the "affairs of their *trust.*" (Emphasis supplied.) The fact that the Act does not name a beneficiary or "show a desire to pass benefits through the medium of a trust and not through some related or similar device," I Bogert, Trusts and Trustees § 46 at 324 (2d ed. 1965), is strong evidence that the use of the term "trust" in Section 4 is made to describe merely the fiduciary duty of care that the Board of Trustees have to the funds received from the Cemetery Company and not to create a legally enforceable trust.

As further evidence of a lack of intent on the part of all parties to create a trust out of the proceeds of lot sales is the historical treatment of these funds. Since 1943, when the IRS ruled that the plaintiff could not claim an exemption as a cemetery company, the plaintiff has consistently filed a Form 1120, U.S. Corporate Income Tax Return, reporting as corporate income the funds paid to plaintiff from the proceeds of lot sales. It was not until the present contested tax deficiency assessment occurred that the IRS questioned the plaintiff's categorization of the funds. Although the IRS is always free to change its interpretation of the tax code as applicable to a given situation, where tax liability is dependent on an interpretation of a party's intent a long course of conduct is highly relevant. The fact that for 25 years the plaintiff has treated these proceeds as corporate income not as trust funds and has filed a corporate income tax return which has been accepted by the IRS is highly probative if not dispositive of the issue of whether there was originally an intent to set up a trust fund out of these proceeds.

For all of the aforementioned reasons we hold that neither the Cemetery Company nor the individual lot owners intended for the fund created from the ten percent of proceeds from lot sales to be a trust, and, therefore, those funds contained in the General Fund account should be treated as corporate assets of the plaintiff and taxed accordingly.

### B—*Marshall Field Fund*

In addition to the General Fund the IRS allocated income to an alleged second trust, the Marshall Field Fund, representing payments made for the care of an individual lot as provided for by Section 9 of the Act of Incorporation. The Marshall Field Fund represents but one of many funds created for the purpose of maintaining a particular lot. By 1965, there were 2,416 other lots being cared for under this section; funds for 78.6 percent of the lots were received prior to 1947. Each owner was told that if he contributed a predetermined minimum amount of money he would be re-

lieved of yearly maintenance charges and the particular lot would be cared for in perpetuity. Presumably if the government is successful in this suit each of the 2,416 separate contributions made under Section 9 would be deemed independent taxable trust entities, and each would be required to file its own federal income tax return, and where the income from investments is large enough, pay federal taxes.

For bookkeeping purposes, the amounts received from lot owners pursuant to Section 9 of the Act of Incorporation are recorded under the heading "Lot Owners' Funds" and subsequently posted in a ledger called the "Cash Book." Each year, under an accounting system set up by an independent certified public accountant and not required by the Act of Incorporation, income from investments of the Section 9 funds is allocated on a pro rata basis to each individual lot being separately cared for. The plaintiff, however, at no time sent financial statements to the lot owners nor consulted with them on investments.

As in the case of the General Fund, the critical element as to whether a trust was set up for each Section 9 contribution is the intent of the parties. No change of interpretation or tax philosophy by the IRS can make corporate assets of the plaintiff into trust funds where the parties never intended the creation of a trust. *See* Oak Woods Cemetery Ass'n v. United States, *supra*; Restatement (Second) of Trusts § 23 (1959). Nothing in the communication between the lot owners and the plaintiff points to an understanding or intent that the funds are to be held in trust. Certainly the fact that for 25 years plaintiff considered them to be corporate assets and consistently dealt with as such on its corporate income tax return, should strongly indicate the absence of an intent to form a trust. The IRS' acquiescence in this approach for those twenty-five years might further indicate the reasonableness of the inference that these funds were not part of a trust.

As further evidence of the lack of intent by any party to create a trust with these funds, is the fact that no where in the Act of Incorporation or in the lot owners' dealing with the plaintiff are beneficiaries of this alleged trust named. With the exception of resulting trusts, constructive trusts or charitable trusts, none of which are allegedly present in this case, the absence of a beneficiary is critical to the existence of a trust. See Restatement (Second) of Trusts § 112 (1959) where it is stated:

> A trust is not created unless there is a beneficiary who is definitely ascertained at the time of the creation of the trust or definitely ascertainable within the period of the rule against perpetuities. [*Id.* at 243.]

*See also* II Scott, Trusts § 112 at 873 (3d ed. 1967).

The government points to the language of Section 9 to show that under the Act of Incorporation the parties were required to consider these payments as being made in trust:

> Sec. 9. Said Trustees may receive and hold any grant, donation or bequest of property, *upon trust,* to apply the same, or the income thereof, to the improvement or embellishment of the said cemetery or any particular lot or lots therein * * *. [Emphasis supplied.]

The mere fact however that the Act uses the words "upon trust" does not by itself mean that the money so received was a trust. *See Oak Woods Cemetery Ass'n., supra;* Costello v. Hillcrest State Bank of University Park, 380 S.W.2d 780 (Tex.Civ.App.1964). In Oak Woods Cemetery Ass'n. v. United States, *supra,* the court held that money set aside by a special chartered Illinois cemetery company for care and maintenance was not held in trust even though the agreement between the lot owners and the company stated:

> [Oak Woods] "shall set apart the amount of said principal sum and shall forever hold the same, *in trust,* for investment, for the permanent im-

provement of and keeping up in good order said cemetery, * * *." [Emphasis in original.] [345 F.2d at 364.] Despite this apparently clear language, the court nevertheless held:

It is our view that because Oak Woods put these funds apart from the general funds, a trust was not thereby created. It was more a matter of careful corporate financial conduct. [*Id.* at 364.]

Similarly, in Costello v. Hillcrest State Bank of University Park, *supra,* the court decided that the fact that a deed to property was made out to "Jim Costello, Trustee" did not necessarily mean that an express trust was formed. The court said: "The mere use of the word 'Trustee' does not of itself *create* a trust. * * *" [*Id.* at 782.] Thus, the particular language used in Section 9 is not determinative of whether the Marshall Field Fund and other funds created under this section are trusts. Where, as here, all other indicia of trusts, such as an expression of intent, and the naming of beneficiaries, are missing it is evidence that the Section 9 contributions do not represent a trust.

 Not only are some basic requirements of a trust missing, but the Act of Incorporation permits the plaintiff to take steps which are inconsistent with the duties placed on a trustee of a trust. Section 7 states that where the fund for the general care and maintenance of the cemetery created out of the percentage of proceeds paid to the plaintiff by the Cemetery Company is "at any time diminished by loss or depreciation of securities, the same shall be immediately made good from *any* other funds coming to the hands of said Trustees * * *," including presumably money received under Section 9. Such commingling of funds, is, under normal trust law a breach of fiduciary duty by a trustee. Harris Trust & Savings Bank v. Wanner, 326 Ill.App. 307, 61 N.E.2d 860 (1945), aff'd, 393 Ill. 598, 66 N.E.2d 867 (1946). By permitting plaintiff to commingle funds received for the perpetual care of

an individual lot, it would seem that the Illinois legislature did not envision that those funds would be considered held in trust.

For all of the aforementioned reasons we hold that the Marshal Field Fund is not a trust but instead a corporate asset of the plaintiff subject to appropriate corporate tax treatment.

### C—*The Lot Owners' Fund*

 The IRS further attempted to allocate income, originally claimed by the plaintiff, to a third entity, the "Lot Owners' Fund," representing an association of "trusts" created by contributions under Section 9, such as the Marshall Field Fund, and taxable as a corporation. The government asserted that since Section 8 permitted the commingling for investment purposes of funds received for individual lot care, the individual trusts allegedly formed from each contribution were engaged in a joint investment venture and taxable as a corporation under section 7701(a)(3) of the Internal Revenue Code of 1954. .

The Internal Revenue Code defines in section 7701(a)(3) organizations taxable as corporations to include "associations, joint-stock companies, and insurance companies." In our recent case, Outlaw v. United States, 494 F.2d 1376, 204 Ct.Cl. 152 (1974), cert. denied, 419 U.S. 844, 95 S.Ct. 78, 42 L.Ed.2d 73 we enumerated the criteria for defining an association taxable as a corporation within this section as follows:

* * * It is clear from * * * [the case of Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935)] and the Regulations that an association will be taxed as a corporation rather than as a general trust or a partnership if it has the following characteristics:

1. Associates.

2. An objective to carry on business and divide the gains therefrom.

3. Continuity of Life.

4. Centralization of Management.

5. Liability for Corporate debts limited to corporate property.

6. Free Transferability of Interests. [*Id.* 494 F.2d at 1380, 204 Ct.Cl. at 160–61.]

The tax regulations further state that the first two requirements, associates and a joint business objective, are most essential; the absence of either one prevents an organization from being called an "association" and being taxed as a corporation. Treas.Reg. § 301.7701–2(a)(2). As the Supreme Court stated in Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935):

3. "Association" implies associates. It implies the entering into a joint enterprise, and, as the applicable regulation imports, an enterprise for the transaction of business. * * *. [296 U.S. at 356, 56 S.Ct. at 295.]

It is apparent to us that the Lot Owners' Fund fails to meet both of these two determinative essential requirements, *i. e.,* it does not comprise associates and there is no discernible objective on the part of alleged "associates" to carry on business and divide the gains, and therefore, it is not a taxable corporate entity under section 7701(a)(3).

The government in this case contends that the associates of this alleged association are the individual "trusts" formed from Section 9 contributions for the perpetual care of individual lots and not the lot owners themselves. It is hard to see how it can be said that an entity such as a trust, having no independent existence of its own, can be an associate or have an objective to carry on a business for joint profit. Moreover, we have already decided that the Marshall Field Fund and all other funds created by contributions for the perpetual care of individual lots do not constitute separate trusts but rather are only corporate assets of the plaintiff. It therefore appears to us even more farfetched to say as the government must, that a corporate asset can be an independent associate of an association or that it can have a business objective. For this reason we hold that

the requirements enumerated in Outlaw v. United States, *supra,* and the associated Treasury Regulations are not met and the Lot Owners' Fund is not an association taxable as a corporation under section 7701(a)(3) of the Internal Revenue Code of 1954.

Since we hold that the three IRS created entities do not exist for tax purposes, we need not resolve the issue of whether the tax deficiencies assessed against them were timely made within the applicable statute of limitations.

### III—*Deductions for Depreciation and Business Expenses*

Since we have decided that the plaintiff in the instant suit is not a tax exempt cemetery company within the meaning of section 501(c)(13) and that the various funds received by it are corporate assets and not independent trusts, we must now turn to the question of the validity of the deductions plaintiff made during the years in question.

On its federal corporate income tax returns, plaintiff deducted as ordinary and necessary business expenses, salaries paid to employees and money paid to the Cemetery Company for its general maintenance of Graceland Cemetery and for the particularized care requested by lot owners for their individual lots. The IRS disallowed all of the Improvement Fund's deductions with the exception of the salaries paid to plaintiff's employees. In addition, the Improvement Fund claimed deductions for the depreciation of improvements made on the chapel building, administrative building, barn and repair shops which it owned but leased to the Cemetery Company. The plaintiff also sought depreciation deductions on a portion of the brick wall and fence at the cemetery. These deductions were likewise denied plaintiff:

Section 162(a) permits a deduction for:

* * * [A]ll the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any

trade or business, * * *. [26 U.S.C. § 162(a) (1964).]

What is an "ordinary" expense is defined on the basis of what is ordinary for a business having the nature and scope of the particular enterprise in question. Anaheim Union Water Co. v. Commissioner, 321 F.2d 253, 258 (9th Cir. 1963). *See also* Deputy v. duPont, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940). Similarly an expense will be considered necessary if it is appropriate and helpful in developing and maintaining the taxpayer's business. Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933).

The particular expenses disallowed in the present case were payments made to the Cemetery Company for such general maintenance of the cemetery as watering, mowing, or planting and also for the particularized care required by individual lot owners as a result of Section 9 payments. All of these expenses are of the type and scope usually associated with companies whose business it is to provide the care and upkeep of cemeteries, and who would clearly be allowed to take a section 162(a) deduction for them. We see no reason why the present plaintiff should be treated any differently. It appears to us to be inconsistent to permit plaintiff to deduct the salaries of employees whose responsibility it is to supervise the care and maintenance of the cemetery and then to deny a deduction for the cost of having that work done by the Cemetery Company.

As an adjunct to a profit-making cemetery company, the money paid by plaintiff is directly applied to cemetery care expenses. The Improvement Fund supervises all of the care and maintenance work done and is directly billed for it by the Cemetery Company. The stipulated facts indicate that the amount charged the plaintiff by the Cemetery Company for this work is both fair and reasonable in the light of prices charged by other cemetery companies in the immediate area. Since plaintiff is charged by its Act of Incorporation with the preservation and maintenance of Graceland Cemetery, these expenditures are clearly within its mandated responsibilities, and, therefore, should be considered as valid trade and business expenses under section 162.

 Nor do we believe that the absence of a profit motive by the nonprofit Improvement Fund is fatal to permitting a deduction under section 162 as the government contends. The profit factor is really only significant insofar as it is a means of distinguishing between an enterprise carried on in good faith as a "trade or business" and an enterprise carried on merely as a hobby, 4 A. Mertens, Law of Federal Income Taxation § 25.08 (1972), or for determining whether profit and nonprofit activities of a single taxpayer may be aggregated and treated as a single integrated trade or business, Iowa State University of Science and Technology v. United States, 500 F.2d 508, 205 Ct.Cl. 339 (1974). In the present case there is nothing to indicate that the plaintiff is maintaining its perpetual care funds as a hobby rather than as a trade or business. Given the particular circumstances of this case, the fact that plaintiff is a nonprofit enterprise should not necessarily preclude his taking a trade or business expense deduction, at least to the extent of income received by it. *See e. g.* Anaheim Union Water Co. v. Commissioner of Internal Revenue, *supra.*[1]

 We therefore hold that the plaintiff should be allowed to deduct as ordinary and necessary business expenses those costs related to the care and maintenance of Graceland Cemetery.

Similarly, we find that there is no reason why plaintiff should not be allowed depreciation on the capital improvement

---

1. In *Iowa State, supra*, we disapproved of Anaheim to the extent it permitted a taxpayer to aggregate his profit and nonprofit making activities and deduct costs associated with a nonprofit function from income generated by unrelated profit-making activities. Where our language in *Iowa State* implies a disapproval broader in scope it concerns issues not before the court in that case and is therefore dicta, not controlling here.

of cemetery property which it owns and leases to the Cemetery Company. Section 167 of the Internal Revenue Code of 1954 states:

(a) General rule.

There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

(2) of property held for the production of income. [26 U.S.C. § 167(a) (1964).]

The plaintiff had title since 1935 to the chapel building, administrative building, barn, and repair shop as well as the brick wall and fence. Under the terms of the 1935 agreement, the Improvement Fund leased these structures to the Cemetery Company. In its income tax returns for the years in question, plaintiff sought to depreciate the cost to it of capital improvements made on this property. The issue is thus whether the particular assets are to be considered as property used in the plaintiff's trade or business.

 Under Section 8 of the Act of Incorporation the Improvement Fund is obligated to use its income in " * * * the improvement, * * * and maintenance of the grounds, * * * enclosures, structures, monuments and memorials, and any and all other things in and about said cemetery which do now or may hereafter appertain to the same or belong to said Graceland Cemetery Company * * *." It seems clear to us that the particular improvements to the property owned by plaintiff for which depreciation is sought here are authorized by the Act of Incorporation and is therefore within the trade or business in which plaintiff participates. That plaintiff is an adjunct to a cemetery company is further evidence that the improvements to buildings used in the running of a cemetery should be depreciable as being part of plaintiff's trade or business. The fact that plaintiff leased the structures to the Cemetery Company should be of no significance since in general a lessor may depreciate property subject to a bona fide lease. North Carolina Midland Ry. v. United States, 163 F.Supp. 610, 143 Ct.Cl. 30 (1958); cf. Kearney & Trecker Corp. v. United States, 195 F.Supp. 158 (E.D.Wis.1961). It is important to note that the Cemetery Company at no time claimed depreciation on this property although it is apparent that had they paid for the improvements the IRS would have allowed them a depreciation deduction. See section 178 of the Internal Revenue Code of 1954. See also Glazer Steel Corp. v. United States, 388 F.2d 990, 181 Ct.Cl. 1063 (1967). Since the property would normally be depreciable and since it comes within the scope of plaintiff's business as defined by its Act of Incorporation, we hold that plaintiff should be allowed a section 167 depreciation deduction on the capital improvements in question. The government has never questioned the manner in which plaintiff calculated the depreciation, and, therefore, we would hold it to be fair and reasonable.

## IV—Motion to Amend Stipulation

We must deny the government's motion to amend the stipulation made after oral argument in this court. Although we could dismiss the the motion on the ground that mutual consent to accept the stipulation change is absent, a more cogent reason for dismissal is that the proposed amendment to the stipulation, dealing as it does with the Marshall Field Fund, is irrelevant in the light of our holding above in section II B.

## V—Summary

In summary, we hold that plaintiff is not a tax exempt cemetery company within the meaning of section 501(c)(13) of the Internal Revenue Code of 1954, but rather, is an adjunct of a profit-making company and takes on the latter's taxable status. We also hold that the funds received by plaintiff as a percent-

age of lot sales and the funds received under Section 9 for care of particular lots are to be taxed as part of plaintiff's corporate assets. Similarly, we hold that the Section 9 payments do not constitute an association for tax purposes. Because we find that these three entities, known as the General Fund, Marshall Field Fund, and Lot Owners' Fund, created by the IRS, do not exist we must dismiss the individual petitions for refunds that were filed in their names and the taxes that were collected from them. must be refunded to the plaintiff. Lastly, we hold that plaintiff should be allowed to deduct as a necessary and ordinary business expense all payments made for cemetery care and upkeep, and in addition, it should be allowed a depreciation deduction on property owned by it and used in the business of maintaining a cemetery, and on capital additions thereto.

## CONCLUSION OF LAW

Upon the foregoing opinion which includes the necessary facts made as a part of the judgment herein, and the facts as stipulated by the parties, the court concludes as a matter of law that the plaintiff is entitled to a refund of all taxes claimed in its petition, together with interest thereon, in accordance with this opinion, except the taxes claimed as a tax exempt corporation, and judgment is entered accordingly. That portion of plaintiff's petition claiming a refund of taxes as a tax exempt corporation is denied and to that extent its petition is dismissed. The assessments of taxes by defendant against the alleged trusts de-. scribed in plaintiff's protective petitions in causes Nos. 447–69; 448–69; and 449–69, known as the "General Fund," the "Marshall Field Fund" and "Lot Owners' Fund" are set aside and declared to be null and void because such trusts did not exist, as shown by our opinion, and plaintiff is entitled to a refund of all taxes collected by defendant on such assessments (which do not duplicate other taxes to be refunded to plaintiff), together with interest thereon, and plain-

tiff's said protective petitions for such alleged trusts are dismissed. Defendant's motion to amend the stipulated facts is denied. The case is remanded to the trial judge for a determination of the amount of plaintiff's recovery in accordance with Rule 131(c)(2).