**DETROIT ATHLETIC CLUB, a Michigan nonprofit corporation, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. 88–CV–71237–DT.**

United States District Court, E.D. Michigan, S.D.

July 11, 1989.

Frank G. Pollock, Timothy G. Reaume, Dickinson, Wright, Detroit, Mich., for plaintiff.

David H. Dickieson, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

### MEMORANDUM OPINION AND ORDER

ZATKOFF, District Judge.

### INTRODUCTION

This case involves an interpretation of the Unrelated Business Income Tax provisions of the Internal Revenue Code of 1954[1] to determine whether losses from Plaintiff's nonmember business for the years 1979 through 1984 can be used as a deduction to offset income earned on Plaintiff's investments. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1346(a)(1) and Section 7422 of the Internal Revenue Code, insofar as claims for

---

1. Hereinafter, unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.

refund were timely filed with Internal Revenue Service (IRS), and the statutory requirements for bringing suit with respect to those claims for refund were satisfied. Testimony was taken on May 16 and 17, 1989. Both sides subsequently filed post-trial briefs setting forth their respective proposed conclusions of law and fact. The Court has reviewed said briefs and the matter is ripe for decision.

## I. FINDINGS OF FACT

Plaintiff, Detroit Athletic Club, is a private social club organized to advance and encourage physical culture, automobiling and manly sports, to promote social intercourse among its members, and to provide for them the convenience of a clubhouse. Plaintiff operates a restaurant and bar, banquet rooms, swimming pool, athletic facilities, and other amenities for the benefit of its members and their guests. At all times relevant to this proceeding, Plaintiff has been a nonprofit corporation exempt from income tax as a "social club" under sections 501(a) and 501(c)(7) of the Internal Revenue Code of 1954, 26 U.S.C. §§ 501(a) and 501(c)(7).[2] Plaintiff's exempt status is not an issue in this case. Plaintiff's fiscal year is the calendar year and Plaintiff timely filed federal income tax returns on IRS Form 990–T (Exempt Organization Business Income Tax Return) for its calendar years 1979 through 1984, the tax years involved in this case.

Plaintiff derives much of its revenues from tax exempt function income, i.e., from membership dues and other fees paid by members for goods and services provided to them or their guests. Plaintiff also derives income from nonmember business in the form of food and beverage sales, guest rooms and garage facilities. In addition, Plaintiff earns income from its investments and advertising. Income from the nonmember business, investments and advertising is classified as "unrelated business taxable income," and is subject to income tax at the regular corporate rates.[3] Admittedly, Plaintiff's nonmember parking, guest rooms, advertising and investments were profitable throughout the subject years. Therefore, the principle testimony and other aspects of the record focused on Plaintiff's food and beverage sales.

### A. NONMEMBER FOOD AND BEVERAGE SALES

Plaintiff derived income from the sale of food and beverages to nonmembers at member sponsored functions such as wedding and other receptions, dinner parties, group luncheon/dinner meetings, seminars and charity fund-raising events (Stip. ¶ 13). In accordance with Rev.Proc. 71–17, 1971–1, C.B. 683, Plaintiff classified all activities with a sponsoring member and eight or more nonmembers as a nonmember activity, required to be reported as unrelated business taxable income on IRS Form 990–T. Conversely, all activities with a sponsoring member and less than eight nonmembers, or where 75 percent or more of a group utilizing club facilities were members, were classified as member activities (Stip. ¶ 14). Nonmember food and beverage activities were classified as private party functions and the business and financial

**2.** Section 501. Exemption From Tax On Corporations, Certain Trusts, Etc. (a) Exemptions From Taxation.—An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under 502 or 503. Section 501(c) List of Exempt Organizations.— The following organizations are referred to in subsection (a): ... (7) Clubs organized for pleasure, recreation, and other nonprofitable purposes, substantially all of the activities of which are for such purposes and no part of the net earnings of which inures to the benefit of any private shareholder.

**3.** For a club like Plaintiff's, the term "unrelated business taxable income" means the gross income (excluding any exempt function income), less the deductions allowed by Chapter 1 of the IRS Code, which are directly connected with the production of the gross income (excluding exempt function income). 26 U.S.C. § 512(a)(3)(A).

Plaintiff's "exempt function income is the gross income from dues, fees, charges, or similar amounts paid by members of the organization as consideration for providing such members or their dependents or guests with goods, facilities, or services in furtherance of the purpose constituting the basis for the exemption of the organization." 26 U.S.C. § 512(a)(3)(B).

statistics were included in Plaintiff's "banquet" classification. It is uncontroverted that food and beverage pricing markups were designed to insure profitability for Plaintiff's banquet functions.

In connection with the nonmember business food and beverage sales, Plaintiff incurred direct expenses such as cost of goods sold, labor costs, replacements and other expenses, as well as overhead/fixed expenses such as administration, taxes, insurance and depreciation.[4] Plaintiff's direct expenses increased or decreased in proportion to increases or decreases in its volume of nonmember business.

Plaintiff internally accounted for its direct expenses on a department-by-department basis. The accounting firm of Ernst and Whinney allocated the direct expenses of each department to the non-member business of such department by multiplying the direct expenses of the department by a ratio, the numerator of which was the department's nonmember sales and the denominator of which was the department's total sales. The total of the direct expenses of all the departments related to Plaintiff's nonmember business is reflected on the second page, line 2 of Plaintiff's Refund Claims, IRS Form 990–T, identified in evidence as Plaintiff Exhibits 1–6. Likewise, Ernst & Whinney allocated an amount of Plaintiff's overhead expenses to its nonmember business by multiplying each designated overhead expense by a ratio the numerator of which was Plaintiff's nonmember sales plus advertising income and the denominator of which was Plaintiff's total sales. The allocation of the overhead expenses to the nonmember business is reflected on a line-by-line basis on page 2, Part II of Plaintiff's Refund Claims, IRS Form 990–T, except for 1979 which had a different format.

Plaintiff's Forms 990–T, both the initial returns and the Refund Claims, used the allocation methods described above (the "allocation methods") consistently during the years at issue. Plaintiff's allocation

methods have been examined by the IRS during various audits of the Plaintiff, most recently with respect to the 1981 through 1983 taxable years, and were not made an issue in this case. Such audits were deemed to be consistent with Proposed Treasury Regulation § 1.512(a)–3, which was in effect during the years in question.

For the years 1979 through 1984, expenses attributable to Plaintiff's nonmember food and beverage sales exceeded revenues. Therefore, Plaintiff netted its excess expenses attributable to sales of food and beverages to nonmembers against the income from investments, thereby reducing unrelated business taxable income. On audit, the IRS only allowed Plaintiff to deduct its expenses for the nonmember sales to the extent of the revenues from those sales. The IRS disallowed the deduction of the excess expenses, and determined that Plaintiff was not entitled to use that loss to offset its gross income from its investments.

## B. DEFICIENCY ASSESSMENTS

Plaintiff paid the IRS on the dates noted, the deficiencies in income taxes assessed against Plaintiff regarding "unrelated business taxable income" as follows:

| Taxable Year | Deficiency | Date Paid |
|---|---|---|
| 1979 | $16,622 | February 19, 1982 |
| 1980 | $16,892 | February 19, 1982 |
| 1981 | $39,826 | May 15, 1982 |
| 1982 | $52,144 | May 12, 1983 |
| 1983 | $39,604 | April 20, 1984 |
| 1984 | $47,865 | May 7, 1985 |

The amounts shown as deficiencies for 1981 and 1982 were initially sent to the IRS on the date shown as "deposits in the nature of a cash bond" under Revenue Procedure 82–51, 1982–2 C.B. 839. The amounts were actually "paid" per the Code on or about October 11, 1985. (Stip ¶ 6) Plaintiff further paid to the IRS on the dates noted all interest charged upon certain of said assessed deficiencies as follows:

| Taxable Year | Interest | Date Paid |
|---|---|---|
| 1979 | $3,958 | June 1, 1982 |
| 1980 | $1,718 | June 1, 1982 (Stip ¶ 7) |

---

**4.** Other deductions include guard service, heat, light, linen, maintenance of supplies, rubbish removal, maintenance of grounds, telephone and telegraph, laundry, newspapers and magazines, flowers and plants, entertainment, other expenses and costs.

The IRS based its deficiency assessments solely upon Revenue Ruling 81–69, 1981–1 C.B. 351 ("Rev.Rul. 81–69") which it had published in March 1981.

The "Holding" of Rev.Rul. 81–69 was:

Because the sales [of food and beverage] to nonmembers are not profit motivated, the social club may not, in determining its unrelated business taxable income under section 512 of the Code, deduct from its net investment income its losses from such sales to nonmembers.

Plaintiff filed timely claims for refund also on Forms 990–T (Refund Claims) of the payment described above on or about the following dates:

| Taxable Year | Date Filed |
|---|---|
| 1979 | February 17, 1984 |
| 1980 | February 17, 1984 |
| 1981 | February 18, 1986 |
| 1982 | February 18, 1986 |
| 1983 | February 18, 1986 |
| 1984 | February 18, 1986 |

With the refund claims for 1979 and 1980, Plaintiff notified and claimed from the IRS the following:

The taxpayer believes Revenue Ruling 81–69 is an incorrect interpretation and application of the law. The taxpayer respectfully requests refund of all amounts paid as a result of the imposition of Revenue Ruling 81–69. (Pl's Exs 1 and 2)

In its refund claims for 1981, 1982, 1983 and 1984, Plaintiff cited to the Sixth Circuit Court of Appeals decision of *Cleveland Athletic Club Inc. v. United States,* 779 F.2d 1160 (6th Cir.1985). Plaintiff informed the IRS of the following:

The taxpayer believes Revenue Ruling 81–69 is an incorrect interpretation of the law and is filing this claim for refund in light of the recent Sixth Circuit Court of Appeals decision involving the *Cleveland Athletic Club.* (Pl's Exs 3, 4, 5 and 6)

In *Cleveland Athletic* the key issue was, as it is in this case, whether a 501(c)(7) organization should be allowed to net the excess expenses attributable to sales of food and beverages to nonmembers against the income from investments and thereby reduce or eliminate unrelated business taxable income for the years in question. The Court found that Section 512(a)(3)(A), "which applies specifically to [501(c)(7) ] social clubs provides that unrelated business income is computed by taking gross income derived from unrelated income, less the deductions allowed by this chapter [Chapter 1] which are directly connected with the production of gross income." *Id.* at 1165. The Court noted that Section 512(a)(3) "begins by computing gross income in general, except exempt function income and subtracts deductions connected with the *production of gross income." Id.* As a result, the Court held that as long as nonmember gross sales exceed costs of goods sold, resulting in a gross profit, the deductions attributable to the production of that income are "allowable as ordinary and necessary to the production of income with a basic purpose of economic gain." *Id.* The Court added:

We do not believe that the non-member business activity must generate a tax profit. "The profit factor is really only significant insofar as it is a means of distinguishing between an enterprise carried on in good faith as a 'trade or business' and an enterprise carried on merely as a hobby." *Trustees of Graceland Cemetery Improvement Fund v. United States,* 515 F.2d 763, 778, 206 Ct.Cl. 609 (1975) quoting, 4 A. Mertens, *Law of Federal Income Taxation,* § 25.08 (1972).

*Id.*

Finally, the Court held that Rev.Rule 81–69 is "without legal force and effect. *Id.* at 1166. In terms of the 990–T Form, the *Cleveland Athletic Club* holding is as follows: If, after subtracting cost of goods sold (line 2 of page 2 of the 990–T) from gross sales (line 1 of page 2 of the 990–T), there is a gross profit, then losses from nonmember business can be used as a deduction to offset income earned on investments. This is permissible even if the result is a zero tax liability.

Even after Plaintiff apprised Defendant of the ruling in the *Cleveland Athletic Club* case, Defendant refused Plaintiff's request for a refund for the tax years 1979–1984. Defendant argued that Plaintiff's situation was different than that of

the plaintiff in *Cleveland Athletic Club*. Specifically, Defendant argued that unlike plaintiff in *Cleveland Athletic Club*, Plaintiff in this case had not shown a gross profit on nonmember sales. Therefore, there was no economic gain as required by the *Cleveland Athletic Club* case. When this matter could not be resolved between the parties this action was commenced.

## II. OPINION

At trial, Defendant continued with its argument that since Plaintiff had not shown a gross profit on its nonmember sales for the tax years 1979–1984, it should not be allowed to use losses from its nonmember business as a deduction to offset investment income. The Court does not agree. Since the filing of this action, Plaintiff has filed amended refund claims. The Court notes that it does not have jurisdiction over the amended claims for refund because they have not been investigated, granted, or denied by the IRS. In addition, they were not filed more than six months prior to the institution of this lawsuit. At trial, this Court excluded the amended claims for refund as evidence in this case. Even so, the Court finds the computations used in the amended refund claims probative in this case.

When Plaintiff's initial refund claims were prepared, there were several items included in cost of goods sold (line 2 of the 990–T) which were later determined to be erroneous. For example, orchestra and floor show expenditures and garage cost of sales were allocated to the nonmember business using the allocation formula discussed earlier, i.e., percentage of nonmember sales to total sales for the food and beverage departments. The orchestra and floor show expenditure was erroneous because only events attended by members used the orchestra and floor shows. Therefore, it should not have been included in the cost of goods sold section. As for the garage cost of sales, the allocation method was erroneous because, except for

minimal amounts, sales of gasoline, oil and washes were only made to members. Excluding both of these allocations from cost of goods sold for the years 1979 through 1983 would have decreased that figure, thereby creating a gross profit.[5]

In addition, in the initial refund claims, labor costs associated with certain "exempt" salaried employees such as the executive chef, pastry chef, chief steward, maitre d', food and beverage manager, purchasing agent, storage manager, head room clerk, garage manager and operations manager were treated as direct expenses for purposes of determining the cost of goods sold and were allocated to nonmember business based upon the allocation formula. After reevaluating the above salaries, Plaintiff classified them as fixed/direct expenses because it would have definitely employed such persons and incurred the costs for them whether or not it had any nonmember sales. Such expenses would be properly allocated as overhead. The result of making the above-mentioned corrections would have resulted in a gross profit on sales, thereby conforming with the requirements of the *Cleveland Athletic* case.

At trial, Defendant argued that introduction of the evidence of the reallocation of certain expenses was improper and asserted the varience defense. The Court permitted the introduction of the evidence as being probative of Plaintiff's profit motive. Interestingly, a similar situation arose in the case *Portland Golf Club v. Commissioner*, 55 TCM (CCH) 212, 1988 WL 12769 (1988). In that case, the taxpayer was able to show a profit motive by introducing evidence at trial that showed a profit utilizing an allocation of overhead expenses based on actual use of its facilities. 55 TCM at 213. The Government argued that such methodology was immaterial to the profit motive determination "since petitioner actually reported the losses from this activity by allocating the fixed expenses in another acceptable manner." *Id.* at 215. The Tax

5. At trial, the United States conceded that Plaintiff's claim for refund for 1984 did show an "economic gain" as that term is used by the

Sixth Circuit in *Cleveland Athletic Club, Inc. v. United States*, 779 F.2d 1160 (6th Cir.1985).

Court rejected the Government's argument that the factual analysis should be limited to the items shown on the Club's tax returns.

█ Like the Court in the *Portland Golf Club* case, this Court finds the method of reallocation of expenses probative of whether Plaintiff was engaging in the nonmember business with the intention of economic gain. Had Plaintiff properly allocated the fixed direct exempt salaries for the years here in issue, as well as excluded orchestra and floorshow and garage expenses from cost of goods sold, it would have had gross income from the sale of food and beverages to nonmembers. The Court notes, importantly, that there was no element of surprise inherent in Plaintiff's introduction of evidence showing the revenues from the nonmember business exceeded the direct expenses related thereto, because the Government asked for such computations before the commencement of trial.

### III. ULTIMATE FINDINGS OF FACT & LAW

█ The Court finds that Plaintiff's initial claims for refund, Plaintiff Exhibits 1–6, do not accurately reflect the economic condition of Plaintiff's nonmember business. Plaintiffs refund claims were inaccurate in that the cost of goods sold section (line 2, page 2 of Form 990–T) included costs which should not have been included or which would have been more appropriately allocated as fixed direct costs in the overhead expense section of the Form 990–T.[6] The Court further finds that based on the testimony on Maurice Bossler, Plaintiff's Executive Manager, and Frank Solak, Plaintiff's Comptroller, a basic purpose of Plaintiff is to carry on its nonmember business with the intention of economic gain. *Cleveland Athletic Club,* 779 F.2d at 1165. There is no indication that the nonmember activities are carried on as a hobby rather than a trade or business. *Id.* Indeed, the credible testimony from Messrs. Bosler and Solak indicated Plaintiff engages in its nonmember business with the intention of making a profit.

Mr. Bossler, gave uncontroverted testimony that Plaintiff's nonmember food and beverage sales, and in particular Plaintiff's banquet functions, generated revenues which exceed the direct expenses associated with the business. In fact, banquet beverage service was much more profitable than Plaintiff's other beverage service because "controlled pouring" at banquets produced three to five more drinks per bottle of liquor. In addition, the markup for food and certain beverages served at nonmember business functions was higher than the markup for food and the same beverages ordered from the regular dining menus utilized by members. In support of this, Plaintiff introduced its Financial Statements which demonstrate that for the subject years, Plaintiff's average income from all banquet meals exceeded its average income from all other meals.[7] More

---

**6.** The orchestra and floor show expense was attributable only to member activities. Therefore, it should not have been included in cost of goods sold. Garage sales (gas, oil and washes) were only made to members, except for minimal amounts. As a result, the use of the allocation method was improper because a disproportionate amount of expense was attributed to nonmembers. Finally, certain exempt salaried employees' salaries were treated as direct expenses and were allocated to cost of goods sold using the allocation method. These expenses should have been properly classified as fixed/direct expenses because the club would have employed such persons regardless of whether it engaged in nonmember sales.

**7.**

|  | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 |
|---|---|---|---|---|---|---|
| a. Avg Income All Banquet Meals | $11.63 | $12.18 | $12.94 | $14.24 | $14.71 | $15.24 |
| b. Avg. Income All Non–Banquet Meals | −7.36 | −8.09 | −9.03 | −9.55 | −9.45 | −9.82 |
| c. Amt Avg Banquet Meal Income Exceeds Non–Banquet Meal Income (a minus b) | $ 4.27 | $ 4.09 | $ 3.91 | $ 4.69 | $ 5.26 | $ 5.42 |

(Pl's Exs 24 and 25)

importantly, Plaintiff's Financial Statements demonstrated that Plaintiff's average income from all banquet meals exceeded Plaintiff's average cost for all meals.[8]

The statistics derived from Plaintiff's Financial Statements were backed up with the testimony of Messrs. Bossler and Solak. Both indicated that costs for banquet meals are less than costs for all meals because there are greater food efficiencies associated with banquet meals. For example, Plaintiff is able (a) to separately price each meal, (b) to plan and prepare exact numbers of meals and exact portions, (c) to take greater advantage of seasonal and discounted prices and (d) to keep waste to a minimum. In addition, banquet functions allow for more efficient use of labor.

## CONCLUSION

In conclusion, it is the opinion of the Court that for the years 1979 through 1984, Plaintiff may net its excess expenses attributable to its nonmember activities, including the sales of food and beverages to nonmembers, against its income from investments, for purposes of determining its unrelated business taxable income. Plaintiff shall submit to the Court, within 5 days of this Opinion, a proposed Judgment. Defendant shall then have 5 days thereafter to file any objections thereto.

IT IS SO ORDERED.

| | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 |
|---|---|---|---|---|---|---|
| a. Avg Income All Banquet Meals | $11.63 | $12.18 | $12.94 | $14.24 | $14.71 | $15.24 |
| b. Avg Costs All Meals | −11.00 | −11.60 | −12.38 | −13.29 | −13.85 | −14.10 |
| c. Amt Avg Banquet Meal Income Exceeds Avg Costs All Meals (a minus b) | $ .63 | $ .58 | $ .56 | $ .95 | $ .86 | $ 1.14 |