Harris Trust and Savings Bank et al., Plaintiffs, v. Harry C. Wanner et al., Defendants.
Appeal of Harry C. Wanner, Individually and as Executor Under the Last Will and Testament of Ruth Hunter Wanner, Deceased, Certain Defendant.

Gen. No. 42,748.

308

Heard in the second division of this court for the first district at the October term, 1943. Opinion filed February 10, 1944. Rehearing opinion filed June 15, 1945. Released for publication June 27, 1945.

JOSEPH E. BELL and JESSE H. BROWN, both of Chicago, for appellant; JESSE H. BROWN, of Chicago, of counsel.

CHAPMAN & CUTLER, of Chicago, for appellees; DAYTON OGDEN and RALPH F. HUCK, both of Chicago, of counsel.

Franklin J. Stransky, *pro se.*

### On Rehearing.

Mr. Presiding Justice Sullivan delivered the opinion of the court.

Harris Trust and Savings Bank and Franklin J. Stransky as trustees of temporary trust 5197, created under a trust agreement dated June 26, 1931, and Harris Trust and Savings Bank as trustee of three certain testamentary trusts set up under the will of Ruth Hunter Wanner, deceased, and as successor trustee of a fourth testamentary trust also set up under said will, filed their complaint in equity praying for the termination of trust 5197, the approval of the trustees' account, instructions as to the disposition of the funds and assets in the trust, and for fees. Harry C. Wanner, who was a party to the temporary trust agreement and designated therein as settlor, filed an answer to the complaint in which he alleged *inter alia* that trust 5197 should not be terminated but that the trustees thereof should be discharged after their account had been surcharged to the extent of $25,756.31, which they had wrongfully paid to the beneficiaries of the aforesaid testamentary trusts instead of to the testamentary trustee.

Thereafter the cause was tried by the chancellor and a decree was entered terminating trust 5197 as prayed, approving the account of the trustees, allowing $2,000 to the Harris Trust and Savings Bank (sometimes hereinafter for convenience referred to as the Bank) and $2,000 to its attorneys as fees, directing the sale of certain assets and the distribution of the cash balance of the trust and ordering the conveyance by the trustees to Harris Trust and Savings Bank as Trustee under the will of Ruth Hunter Wanner (hereinafter referred to as the testamentary trustee) of the apartment building at 5442 Hyde Park boulevard, Chicago. Wanner, individually and as executor under

the will of Ruth Hunter Wanner, deceased, appealed from the decree.

In an opinion filed by this court on February 10, 1944 we reversed the decree of the trial court, holding that "the chancellor erroneously decreed the termination of the Trust, the approval of the Trustees' report and account, the distribution of the cash on hand, the ordering of the sale of certain assets, the conveyance by the Temporary Trustees to the Testamentary Trustee of the Hyde Park property and the allowance of fees to the principal Trustee," and directed that the trustees of trust 5197 "be discharged after being surcharged with the payments made to the testamentary beneficiaries, aggregating $25,756.31, and upon the approval of their report and account in other respects." On March 9, 1944 we allowed plaintiffs' petition for a rehearing.

This cause was heard by the chancellor upon undisputed documentary evidence introduced by the trustees and the testimony of W. G. Griffith, an assistant secretary of the Harris Trust and Savings Bank, who administered the various trusts in question on behalf of the Bank. Ruth Hunter Wanner died testate November 21, 1928 and her will was admitted to probate January 12, 1929. The provisions of her will which gave rise to this litigation may be briefly summarized as follows: Under the second paragraph thereof she left to her granddaughter, Janet Wanner (now Janet Wanner Martin) the income for life from a trust fund of $50,000, payable semiannually, the fund to go to Janet's heirs upon her death. In paragraph 4 of the will the testatrix set up three other trusts for her nieces, Laura Hunter, Edna Hunter Reist (later Edna Hunter Bachelle) and Bessie Hunter Hayes, by which they were each given the income for life from $25,000, also payable semiannually, each of the funds, upon the death of the respective beneficiaries, to go to Harry C. Wanner, her son. Harris Trust and Savings Bank

was appointed trustee of the three $25,000 trusts and Wanner, who was appointed executor without bond and was made the residuary legatee, was appointed trustee of the Janet Wanner trust for $50,000.

Upon the death of Wanner's mother there came into his possession, as executor of her estate, real and personal property having an actual value of more than $200,000. He paid the specific bequests made in his mother's will amounting to approximately $18,000 but failed and refused to establish and fund the various trusts as directed by her will. As has been seen, the funding of these testamentary trusts required an aggregate of $125,000. Commencing early in 1929 the Bank as trustee of three of the testamentary trusts made repeated and insistent demands upon Wanner to fund such trusts and finally, after admitting that he was unable to establish same, he executed the trust agreement on June 26, 1931, designated as trust 5197, conveying and transferring to Harris Trust and Savings Bank and Franklin J. Stransky as temporary trustees certain assets consisting of an income-producing apartment building at 5442 Hyde Park boulevard, Chicago, several other parcels of real estate and various securities. In said agreement creating trust 5197 Wanner resigned as testamentary trustee for his daughter, Janet, and the Bank became his successor. Of the assets conveyed and transferred by Wanner to trust 5197 only two of them were listed in the inventory filed by him in his mother's estate—the apartment building at 5442 Hyde Park boulevard and ten shares of stock that proved to be of no value. All of the other assets—real estate and securities—conveyed and transferred to trust 5197 by Wanner belonged to him personally and the total amount that the temporary trustees were able to realize from their sale or liquidation was approximately $12,000. None of the numerous sound securities, including Government bonds, which were inventoried by Wanner in his

mother's estate, were transferred by him to trust 5197.

The agreement creating trust 5197 is a lengthy document. It recites the demand by the trustee of the beneficiaries of three of the testamentary trusts for immediate establishment in cash of the trust funds created by the will, Wanner's inability to comply with the request, his desire to establish as soon as practicable said three trust funds and the trust provided for the benefit of his daughter, Janet, his wish to have the Bank appointed in his place and stead to take charge of and administer the Janet Wanner Trust, the willingness on the part of the Bank to accept the appointment, "all to the end that said Harris Trust and Savings Bank will act as Testamentary Trustee for the fund provided for in said Last Will and Testament for the benefit of Edna Hunter Reist, Laura Hunter and Bessie Hunter Hayes and also as Testamentary Trustee for the fund provided in said Will for the benefit of said Janet Wanner . . . ," his desire "that all of the said trusts provided for in said Last Will and Testament . . . be established in cash as soon as the same may be done without the great and irreparable loss which would ensue if the property of said estate were to now, under present market conditions, be converted into cash." The agreement further recites that Wanner "is desirous of making a temporary trust pending the establishment of the trust provided for in said Last Will and Testament, and is therefore about to convey, assign, transfer and set over unto said Temporary Trustees . . ." the various securities and real estate which were described in a schedule attached to the trust instrument. The foregoing provisions were contained in the preamble of the trust agreement.

Section two of the trust agreement provides in part as follows:

"It is agreed and understood that the *interest* of the Settlor and of said Trustee for Edna Hunter

Reist, Laura Hunter and Bessie Hunter Hayes and said Trustee for Janet Wanner *shall consist solely of the right to receive the proceeds from the sale, maturity and/or other liquidation of said real estate and/or securities. . . ."* (Italics ours.)

Section eight provides:

"Subject to the provision of Section Fourteen hereof, the Temporary Trustees shall have no duties in respect to the management and control of said real estate, or of the selling, renting or handling thereof, it being the intention that said Settlor shall have full and complete management and control of said real estate, and the Settlor himself, or through agents, may collect, receive and retain the rents and/or income from said real estate; provided, however, that said *Settlor, out of the proceeds collected from the rents and/or income from said real estate, shall pay to said Temporary Trustees sufficient to pay the income on said Seventy-five Thousand Dollars . . . trust fund provided for in the Last Will and Testament of Ruth Hunter Wanner, deceased, for said Edna Hunter Reist, Laura Hunter and Bessie Hunter Hayes, and to pay the income on said Fifty Thousand Dollar . . . trust fund provided for in the Last Will and Testament of Ruth Hunter Wanner, deceased, for said Janet Wanner."* (Italics ours.)

The only "provision" of section fourteen that the provisions of section eight were "subject to" was that if Wanner did not completely fund the testamentary trusts by September 1, 1932, his right to control and manage the real estate and to collect the rents therefrom would cease on that date and after said date the temporary trustees would be vested with complete control of the real estate, including the right to lease same and collect the rents.

Section thirteen provides in substance that trust 5197 was to continue until such time as the testamentary trustee received the principal amount of each trust, plus interest and fees for itself and counsel;

that "until such time . . . this trust shall continue in full force and effect, but when said sums have been fully paid, this trust shall terminate and all securities, real estate and/or cash then held by the Temporary Trustees immediately shall be conveyed, transferred, assigned and/or delivered to the Settlor, or to his heirs, executors, administrators and assigns; provided, however, that if Edna Hunter Reist, Laura Hunter or Bessie Hunter Hayes shall die prior to the termination of this trust, then upon the death of each of them the amount due to the Trustee for said [beneficiaries] . . . shall be reduced by the sum of Twenty-five Thousand Dollars . . ."; and that "*The entire proceeds derived from any sales, maturities and/or other liquidations of said real estate and securities, or any part thereof, remaining after the payment of the compensation of the Temporary Trustees . . . and all taxes, expenses and other charges . . . shall be paid to the Trustee for said Edna Hunter Reist, Laura Hunter and Bessie Hunter Hayes and the Trustee for Janet Wanner to be ratably divided among said several trust funds.*" (Italics ours.)

Section fourteen provides in substance that the right given Wanner under section eight to manage and control the real estate and to collect the rents therefrom would terminate on September 1, 1932, if he had not completely funded the four testamentary trusts by that time, after which date the temporary trustees were given uncontrolled discretion and power to do anything they deemed necessary and proper "to realize cash for the payment to the Trustee for Edna Hunter Reist [etc.] . . . and to the Trustee for Janet Wanner of the sums to which they are entitled under the provisions of Section Thirteen hereof . . . ."

Pursuant to the execution of the trust agreement, the administration of the temporary trust was placed by the Bank in the hands of W. G. Griffith, one of its

assistant secretaries, who was an experienced trust officer and familiar with the Wanner situation. He set up a trust ledger and a bank account for trust 5197 and through this account passed all moneys coming into the hands of the temporary trustees. The ledger contains entries showing the following payments made by the temporary trustees from June 26, 1931 to September 16, 1942 out of the net rents received from the Hyde Park boulevard apartment building to or on behalf of the beneficiaries of the trusts designated in the will of Ruth Hunter Wanner:

"Edna Hunter Bachelle..............$ 5,697.22

Bessie Hunter Hayes.............. 5,697.22

Laura Hunter (up to the time of her death) ..................... 2,917.22

In addition to the payment so made to Laura Hunter, her funeral expenses were paid from said trust, amounting to ..................... 50.00

To or on behalf of Janet Wanner Martin ......................... 11,394.65

Total payments to beneficiaries of trusts designated by the will of Ruth Hunter Wanner, deceased ..........$25,756.31"

Following is a summary of the cash receipts and disbursements of trust 5197 during the same period:

"Receipts

Rents from property—5442 Hyde Park Blvd., Chicago, Illinois..............$41,857.10

Dividends on 50 shares Associated Telephone Utilities $7 Cumulative Prior Preferred Stock ................... 175.00

Proceeds of sale (including recovery by suit) on sale of $40,000 principal amount of New Smyrna Deland Drainage District bonds—net ............ 1,728.90

Cash proceeds of sale of $202,500 principal amount of Wanner Malleable Castings Company bonds .......... 7,499.63

Proceeds of sale of 50 shares Associated Telephone Utilities $7 Preferred Stock @ ¼ ........................... 12.50

Proceeds of sale of real estate in River Plaza Addition to the City of Hammond, Indiana ................... 200.00

Proceeds of sale of undivided ¼ interest in East Half of Northwest Quarter of Northwest Quarter of Section 11, Township 36, North, Range 9, West of the Second Principal Meridian in Lake County, Indiana ................... 16.85

Total.·......... $51,469.98

"Disbursements

Payments to beneficiaries of trusts designated in will of Ruth Hunter Wanner .............................. $25,756.31

Taxes paid on property at 5442 Hyde Park Blvd., Chicago, Illinois........ 14,162.55

Fuel for same premises................ 302.41

Insurance for same premises.......... 404.04

Decorating and repairing, etc., same premises ......................... 530.54

Miscellaneous expenses, same premises.. 122.63

Fees of Harris Trust and Savings Bank in respect of same premises, for period beginning January 1, 1934, and ending February 2, 1942, only.............. 1,466.80

Divers federal taxes.................. 516.17

Miscellaneous expenses re administration of said trust.................... 138.03

Total.......... $43,399.48

Total receipts of Trust No. 5197...... $51,469.98

Total Disbursements of Trust No. 5197.. $43,399.48

Balance of cash in Trust No. 5197....... $8,070.50.''

In addition to the cash balance of $8,070.50, the only assets of any value remaining in trust 5197 when the complaint was filed herein on September 16, 1942, were the apartment building at 5442 Hyde Park boulevard, the reasonable value of which was shown to be $27,500, and a note for $2,625.37 received by the temporary trustees as part of the purchase price when they sold the Wanner Malleable Castings Company bonds for $10,125. These bonds were sold just two months before the complaint was filed. Although the securities turned over by Wanner to trust 5197 had a face value of $315,300, all that the temporary trustees were able to realize from the sale thereof was $11,866.40 and all that they were able to realize from the sale of the real estate he conveyed to said trust, other than the Hyde Park Boulevard apartment building, was $216.85.

That the temporary trustees had the right to rent the apartment building is not questioned and it will be noted that the total net rents collected from same during the period covered by the foregoing account—from June 26, 1931 to September 16, 1942—amounted to $26,334.96, which is slightly more than the $25,756.31 paid out of such net rents to the beneficiaries of the testamentary trusts. The only other income received by the temporary trustees was $175 in dividends on one item of stock. Prior to the sale of the Wanner Malleable Castings Company bonds on July 17, 1942 for $10,125—$7,499.63 in cash and a note for $2,625.37 —all the cash that the temporary trustees ever had in their hands from the proceeds of the sale or liquidation of the real estate and securities in trust 5197 was $1,958.25 and Wanner authorized said trustees in writing in March 1934 to treat $1,000 of that amount as ''accrued income'' and directed them to disburse said $1,000 pro rata to the beneficiaries of the testamentary trusts.

Wanner's principal contention is that ''the Trustees wrongfully paid $25,756.31 to the beneficiaries of the Testamentary Trusts.'' In other words he

insists that the temporary trustees had no power or authority under the trust agreement creating trust 5197 to pay the beneficiaries of the testamentary trusts on a pro rata basis the net rentals from the apartment building and that the account of said temporary trustees should be surcharged to the extent of such payments. It is of course the law that the powers of trustees and the purposes of a trust must be determined by the agreement creating the trust. As, was said in *Chicago Title & Trust Co. v. Chief Wash Co.*, 368 Ill. 146, at page 153, ". . . a trust itself constitutes the charter of the Trustee's powers and duties. From it he derives the rule of his conduct and it not only prescribes the extent and limit of his authority, but also furnishes the measure of his obligations. (3 Pomeroy's Eq. Jur. (4th Ed.) Sec. 1062)." Wanner asserts that the agreement creating trust 5197, properly construed in the light of this settled rule of law, clearly shows that the sole purpose of said trust was to establish the testamentary trusts "in cash as soon as the same may be done" and that all cash that came into the hands of the temporary trustees, including the net rents from the apartment building, should have been turned over to the testamentary trustee for that purpose.

In our original opinion we stated: "The powers and duties of the Trustees under Trust No. 5197 were clearly defined. The predominant idea in the Trust instrument that the funds were to be paid over to the Testamentary Trustee appears in several sections thereof. They are clear, understandable and unambiguous." In view of the fact that in our original opinion we differed with the trial court as to the intent and meaning of the trust agreement and then allowed a petition for rehearing, it must be considered that the language of that instrument is not altogether free from ambiguity. Therefore in order to properly understand and interpret the provisions of the trust

agreement, it is necessary to consider the facts and circumstances preceding and surrounding its execution as well as the nature of the instrument itself.

As already shown, Wanner's mother left an estate of more than $200,000. When she died in November 1928, values of real estate and securities were at their highest and so continued for a considerable time thereafter. At the time of her death her estate was adequate to fund the testamentary trusts, to pay all of the specific legacies and still leave a substantial residue. Notwithstanding the persistent demands of the Bank as testamentary trustee, Wanner, for some reason not disclosed by the record, failed and refused to fund any of the testamentary trusts. Then when the only asset of value remaining in his mother's estate was the apartment building on Hyde Park boulevard and Wanner was personally insolvent, he finally consented on June 26, 1931 (more than two and one-half years after his mother's death) to enter into the agreement with the Harris Trust and Savings Bank and Franklin J. Stransky as trustees of temporary trust 5197 and Harris Trust and Savings Bank as trustee of three of the trust funds created by his mother's will to establish such temporary trust for the benefit of Edna Hunter Reist, Laura Hunter, Bessie Hunter Hayes and Janet Wanner, and under the terms of said agreement he conveyed and transferred to the temporary trustees the aforesaid apartment building and some real estate and securities of his own of comparatively little value.

There can be no question but that during the course of the negotiations that culminated in the execution of the trust agreement Wanner was actuated by a desire to make such amends as he could for his wrongful failure to fund the testamentary trusts and that the Bank as trustee of three of the testamentary trusts, having discovered the insolvency of Wanner and his inability as executor to fund the trusts created

by his mother's will, determined to salvage whatever assets and income it could for the benefit of the beneficiaries of said testamentary trusts.

This brings us to the interpretation of the trust agreement and upon reconsideration we think that it can only be reasonably construed as having a two-fold purpose and as clearly differentiating between the duty and power of the temporary trustees in their disposition of the proceeds from the sale or liquidation of the real estate and securities entrusted to them and their disposition of the net rents from the Hyde Park boulevard apartment building.

As will be shown, one purpose of trust 5197 was to fund the testamentary trusts, if possible, from the proceeds of the sale or liquidation of the real estate and securities conveyed and transferred by Wanner to such trust and the other purpose of trust 5197 was to have the net rents from the apartment building paid to the beneficiaries of the testamentary trusts, so that they would receive at least some of the income that they would have been paid if Wanner had performed his duty as executor in funding the trusts created under his mother's will.

In support of his instant contention that the temporary trustees wrongfully paid the net rents from the apartment building to the beneficiaries of the testamentary trusts and that they should have paid them to the testamentary trustee for the purpose of funding the testamentary trusts, Wanner seems to rely particularly upon certain provisions of section fourteen of the trust agreement. Our attention is called to that portion of section fourteen which provides that if the testamentary trustee had not received from Wanner by September 1, 1932 the full amount to which it was entitled under section thirteen ($125,000 plus interest on that amount from November 21, 1929), "the rights and powers hereinbefore given and granted to the Settlor in Sections Seven and Eight hereof, thereupon

shall cease and determine'' and the temporary trustees thereafter shall be vested with full right, power and authority to do all things necessary ''to realize cash for the payment to the Trustee for Edna Hunter Reist, Laura Hunter and Bessie Hunter Hayes and to the Trustee for Janet Wanner of the sums to which they are entitled under the provisions of Section Thirteen hereof . . . .'' He then urges that the aforesaid provisions of section fourteen are conclusive as to the temporary trustees' lack of power and authority to pay the net rents of the apartment building to the beneficiaries of the testamentary trusts and as to their duty to turn over such rents to the testamentary trustee toward the funding of the testamentary trusts.

We are unable to discover any such intent or meaning in the foregoing provisions of section fourteen as Wanner attributes to them. First they abrogated Wanner's right to control the real estate and securities as given him under section seven and his right to manage and rent the apartment building as given him under section eight, because of his failure to completely fund the testamentary trusts by September 1, 1932. Then after that date the temporary trustees were vested with full power to do all things necessary ''to realize cash'' for the payment to the testamentary trustee of such funds as the beneficiaries of the testamentary trusts ''are entitled to receive under the provisions of Section Thirteen.'' Thus the purpose for which the temporary trustees were given full power under section fourteen to do all things necessary ''to realize cash'' for payment to the testamentary trustee is that plainly stated in section thirteen. That section, in addition to providing for payment to the testamentary trustee of the principal amounts of the four testamentary trusts plus interest from November 21, 1929, specifically provides that ''*the entire proceeds derived from any sales, maturities and/or other liquidations of said real estate and securities* . . . shall be paid to the Trustee

for said Edna Hunter Reist, Laura Hunter and Bessie Hunter Hayes and the Trustee for Janet Wanner to be ratably divided among said several trust funds . . . ." The only meaning that can be fairly deduced from these provisions is that the temporary trustees were required to pay the testamentary trustee the proceeds realized by them from the sale or liquidation of the real estate or securities and there is no language used in either section thirteen or section fourteen that even remotely suggests any intention of requiring the temporary trustees to pay to the testamentary trustee any cash, which came into their hands, as rents or income from the apartment building.

The only other provision of the trust agreement that pertains at all to the payments to be made by the temporary trustees to the testamentary trustee out of the funds in trust 5197 is that found in section two and that section expressly provides that the *interest* of Wanner and of the testamentary trustee for Edna Hunter Reist, Laura Hunter, Bessie Hunter Hayes and Janet Wanner shall consist *solely of the right of the testamentary trustee to receive the proceeds from the sale or liquidation of the real estate and securities.*

In our opinion the clear, explicit provisions of section two and section thirteen leave no doubt that the interest not only of the testamentary trustee but of Wanner in the disposition of funds that came into the hands of the temporary trustees was confined solely to the right of the testamentary trustee to receive the proceeds from the sale or liquidation of the real estate and securities conveyed and transferred by Wanner to trust 5197 and exclude any possible right of the testamentary trustee to receive the net rents from the apartment building. It necessarily follows that the temporary trustees had no power or authority to make any payments from trust 5197 to the testamentary trustee except those which the latter was entitled to receive.

The rather voluminous trust agreement, which consists of ten pages and includes seventeen sections in addition to a lengthy preamble, may be searched in vain for any provision pertaining to the disposition of the rents from the apartment building except those found in section eight thereof. It is expressly provided in section eight that initially Wanner should have the management and control of the apartment building and should collect the rents himself and that *"from the rents* and/or income *from said real estate"* he *"shall pay to said Temporary Trustees sufficient to pay the income on said Seventy-five Thousand Dollars ($75,000) trust fund* provided for in the Last Will and Testament of Ruth Hunter Wanner, deceased, for said Edna Hunter Reist, Laura Hunter and Bessie Hunter Hayes, *and to pay the income on said Fifty Thousand Dollar ($50,000) trust fund* provided for in the Last Will and Testament of Ruth Hunter Wanner, deceased, for said Janet Wanner." (Italics ours.)

While, as heretofore shown, the right initially given to Wanner to manage the real estate and to collect the rents therefrom terminated on September 1, 1932, nevertheless, nowhere in the trust agreement was there any attempt made to change the foregoing substantive provision of section eight that out of the *"rents* and/or income *from said real estate"* there should be paid "to the Temporary Trustees" an amount "sufficient to pay the income" on the trusts provided for in the will. ·

Defendant insists that under section fourteen "Section Eight expired on September 1, 1932" and was thereafter "defunct." While it is true that Wanner had no right to manage the apartment building and collect the rents after that date, there is nothing in section fourteen or any other section of the trust agreement that indicates an intention to change the purpose manifested in section eight that the net rents from the apartment building were to be applied by the temporary trustees toward the payment of the income the

beneficiaries of the testamentary trusts would have received if Wanner had funded those trusts as directed by his mother's will. Section eight itself contemplated the contingency that the temporary trustees would succeed Wanner in the management of the apartment building and the collection of the rents and it is difficult to perceive how the fact that they stepped into Wanner's shoes and thereafter collected the rents, rendered it any less their duty to see that the net rents were applied as payment of income to the beneficiaries of the testamentary trusts than it was when Wanner collected the rents. It seems to us that the only reasonable construction that the provisions of section eight are susceptible of is that the temporary trustees were not only authorized to receive the net rents from the apartment building for the benefit of the beneficiaries of the testamentary trusts but that they were obligated to do so and that, having collected and received such rents for their benefit, they had the right and authority to pay same as income directly to said beneficiaries.

The only one now objecting to the manner in which trust 5197 was administered is Wanner and it is important to note how he construed the trust agreement. From the very inception of the temporary trust until the complaint herein was filed, he knew that the Bank was paying the net rents from the apartment building to the beneficiaries of the testamentary trusts. The Bank mailed him quarterly reports showing such payments and during the entire period involved he interposed no objection. And, as has been shown, he even authorized the Bank in writing to pay to said beneficiaries as ''accrued income'' $1,000, which was actually principal. This written authorization to the temporary trustees to pay part of the principal of trust 5197 to the beneficiaries of the testamentary trusts as ''accrued income'' would seem to indicate Wanner's recognition of the fact that the trust agreement itself

authorized the temporary trustees to pay as income to said beneficiaries the net rents received by them.

To say that the net rents from the apartment building should have been turned over by the temporary trustees as principal to build up the corpus of the testamentary trusts would be to hold that trust 5197 was created primarily for the benefit of Wanner, who was the remainderman of the $25,000 trusts and a possible remainderman of the $50,000 trust, rather than for the benefit of the beneficiaries of the testamentary trusts, some of whom were in necessitous circumstances *and all of whom were wronged by Wanner's failure to fund said trusts.* To so hold would not only be highly inequitable but contrary to the intention of the parties to the trust agreement as expressed therein. As was said by the chancellor in an opinion filed by him in deciding this case, it would be a complete perversion of the will of the testatrix which the temporary trust was designed to serve and not obstruct, if the income (net rents) were allowed to be used to build up the corpus of the testamentary trusts and the beneficiaries of such testamentary trusts were only paid the income from the corpus as it was being built up. This could not possibly have been the intent of the trust agreement, because it would have enabled Harry C. Wanner to profit by his own wrongful act.

Wanner also contends that the account of the temporary trustees should have been surcharged $3,875, representing the loss on the sale of $202,500 Wanner Malleable Castings Company bonds to one Ellis for $10,125, when $14,000 could have been obtained. In answer to this contention it is only necessary to repeat what we said in our original opinion in reference thereto: ''Another offer by Sam Lans of $14,000 was rejected. Wanner's counsel argue that Trust No. 5197 thereby lost $3,875, for which the Trustees should be surcharged. It appears from the evidence that efforts had been made for a considerable

period to liquidate these bonds. July 13, 1942 Lans offered $10,125, specifying certain conditions which could not well be met, and imposed a time limitation of two days for the acceptance of his offer. Thereafter Ellis tendered the same amount, not subject to the objectionable conditions, and his offer was accepted after the two-day limitation had expired. Later Lans came back with another offer of $14,000, but not until after the bonds had been sold to Ellis. From an examination of the record we are satisfied that this transaction was regular. There is no evidence as to the real value of the bonds and they were sold to the highest bidder under the only offer which the Trustees could accept."

■ Wanner next contends that the chancellor erred "in terminating the Trust in contravention of the provisions of the trust agreement re termination." It is one of the elemental principles of the law of trusts that a trust should be terminated when the accomplishment of its purpose becomes impossible. (2 Perry on Trusts (2nd Ed.) sec. 920; 4 Bogert, Trusts, Sec. 997; 3 Scott on Trusts, Sec. 335.) Wanner was admittedly insolvent at the time of the trial and, although he was also insolvent when trust 5197 was created, he then at least hoped that he would be able to fully and properly fund the testamentary trusts. More than eleven years had elapsed since the creation of trust 5197 when plaintiffs' complaint was filed and nearly twelve years had elapsed when the trial was had and there was not only no prospect but not even a vestige of hope remained that the testamentary trusts would or could be funded by Wanner. When the complaint was filed herein the only assets in trust 5197 were the apartment building, valued at $27,500, $8,070.50 in cash and the note for $2,625.37. The beneficiary of one of the $25,000 trusts having died, $100,000 was required to fund the three remaining testamentary trusts. It would be necessary for Wanner to supply approximately $60,000 in additional as-

sets to fund these trusts and this it was admittedly impossible for him to do. In our opinion the chancellor properly found that "the temporary trust was intended to be a temporary trust, that it can never be terminated pursuant to its provisions because of the insolvency of Harry C. Wanner and his failure to comply with his duty as executor, and therefore should be terminated."

■ The claim advanced by Wanner that the assets in trust 5197 should have been ordered returned to him upon its termination does not merit serious consideration, because the trust agreement provides that only in the event that the proceeds from the sale or liquidation of the real estate and securities, which he conveyed and transferred to trust 5197, exceeded the amount necessary to completely fund the testamentary trusts, should the surplus be returned to him.

The decree found that there was $9,543.02 in cash in trust 5197 at the time of the trial and directed that, after the payment out of said amount of $2,000 each to Harris Trust and Savings Bank and its attorneys as fees for their services in connection with the administration of said trust, of $300 to John J. Kelly, who was appointed to represent persons not in being, and of $1,350 to Harris Trust and Savings Bank for the payment of the 1942 real estate taxes on the apartment building, the remainder of said $9,543.02 should be distributed ratably to the three living beneficiaries of the testamentary trusts. The decree then directed the temporary trustees to convey the property at 5442 Hyde Park boulevard to Harris Trust and Savings Bank as testamentary trustee, approved the account of the temporary trustees and ordered the termination of trust 5197. We are now convinced that the decree is in all respects proper, that the chancellor had no alternative but to order the termination of trust 5197 and that the assets in said trust at the time of its termination were liquidated in an equitable manner.

For the reasons stated herein the decree of the superior court of Cook county is affirmed.

*Decree affirmed.*

SCANLAN, J., concurs.

FRIEND, J., dissents for the reasons indicated in the original opinion.