T.C. Memo. 2011-255

UNITED STATES TAX COURT

ESTATE OF VINCENT J. DUNCAN, SR., DECEASED, NORTHERN TRUST, NA
AND VINCENT J. DUNCAN, JR., CO-EXECUTORS, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7549-10.                    Filed October 31, 2011.

Thomas C. Borders, Carol A. Harrington, and Michael J.
Sorrow, for petitioner.

H. Barton Thomas, Jr., Tracy Hogan, and James Cascino, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, Judge: Respondent determined a $4,900,760
deficiency in the Federal estate tax of the Estate of Vincent J.
Duncan, Sr. (the Estate). After concessions, we are asked to

decide three issues. The first issue is whether the Estate may deduct interest incurred when a trust, which was the residual beneficiary of the Estate and the value of whose assets were included in the value of the gross estate, borrowed funds to enable the Estate to pay its Federal estate tax as an administration expense. We hold that the interest expense is deductible. The second issue is whether the Estate may decrease the gross estate. We hold that it may not. The third issue is whether the Estate may deduct additional administration expenses that were not claimed on its estate tax return. We hold that it may to the extent described below.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated by this reference. Vincent J. Duncan, Sr. (Decedent) resided in Denver, Colorado when he died, and the Estate was admitted to probate in California, Colorado, Texas and Montana. Decedent's son, Vincent J. Duncan, Jr. (Vincent Jr.), and Northern Trust, NA (NTNA) are co-executors of the Estate. NTNA and the Northern Trust Company (NTC) are wholly owned subsidiaries of the Northern Trust Corporation. When the petition was filed, Vincent Jr. resided in Denver, Colorado, and the Northern Trust Corporation's principal place of business was Chicago, Illinois.

Decedent's father, Walter Duncan (Walter), established a successful oil and gas business.[1]  At Walter's death in 1983 his will divided the business among Decedent and his brothers, Raymond and Walter Jr., with each receiving his share of the business in trust.  The trust created for Decedent's benefit (the Walter Trust) named Decedent, Decedent's spouse and Decedent's descendants as beneficiaries during Decedent's lifetime.  The trust granted Decedent the power to appoint the trust's remainder beneficiaries at his death.  Vincent Jr. and NTC have served as the co-trustees of the Walter Trust since September 2005.

After inheriting one-third of Walter's oil and gas business, Decedent started his own oil and gas business.  Decedent's oil and gas business was held through a limited partnership, Club Oil & Gas, Ltd., LP (Club LP).  At Club LP's formation Decedent held a 99-percent limited partner interest.  The remaining 1-percent general partner interest was held by Club Oil and Gas, Inc. (Club Inc.), an S corporation wholly owned by Decedent.

In addition to his ownership of these oil and gas businesses, Decedent acquired complete ownership of the Durango Ski Company (DSC) in 1990.  DSC operated a ski resort in Durango,

---

[1]Walter also served on the Board of Trustees of the University of Notre Dame.  The Duncan family has a long history with the university, with three of Walter's sons and several of his grandchildren having graduated from the university.  Walter's son Raymond made a gift to the university that enabled the construction of a new residence hall, Duncan Hall, which opened in 2008.

Colorado and owned real property near the resort. Decedent later restructured the ownership of the ski resort and nearby land, with the ski resort continuing to be held by DSC and ownership of the land being placed in Durango Mountain Land Company LLC (DML). By December 30, 2005, Decedent had sold portions of his interest in DSC and DML to a group of investors (the Cobb group).

Decedent created a revocable trust, the Vincent J. Duncan 2001 Trust (the 2001 Trust). In June 2004 Decedent amended the 2001 Trust's trust instrument. The amended trust instrument (the Trust Instrument) appointed Vincent Jr. and NTC as co-trustees and is governed by Illinois law. Under the Trust Instrument, the Estate's obligations and "death" taxes are to be paid by the 2001 Trust after Decedent's death. After payment of those obligations and taxes, the 2001 Trust is to be divided into six trusts, each named after one of his six children (collectively, the 2001 Subtrusts). The Trust Instrument designates the child after whom a 2001 Subtrust is named as the "primary beneficiary" of that particular trust. Each "primary beneficiary" and his or her spouse is the beneficiary during his or her lifetime of the 2001 Subtrust named after him or her. Each "primary beneficiary" has the power to appoint at his or her death any person or entity as the remainder beneficiary of his or her trust. The 2001 Trust has not yet been divided into the 2001 Subtrusts. NTC has

received and continues to receive trust management fees for its role as co-trustee.

By December 30, 2005, Decedent had transferred his interest in Club LP to the 2001 Trust. On December 31, 2005, Decedent reorganized the ownership structure of the oil and gas businesses. As part of the reorganization, the Walter Trust contributed the oil and gas business that Decedent inherited from Walter and approximately $2 million in cash to Club LP in exchange for a 56.6245-percent partnership interest. Club LP subsequently converted into Club Oil & Gas Ltd. LLC (Club LLC), and the 2001 Trust assigned its membership interest in Club LLC to Club Inc.

Decedent died on January 14, 2006. Decedent exercised his power of appointment over the Walter Trust in his will, which directed the Walter Trust's corpus to be distributed pursuant to the Trust Instrument. The Trust Instrument required the Walter Trust to be divided into six trusts, each named after one of Decedent's six children (collectively, the Walter Subtrusts). As with the 2001 Subtrusts, the Trust Instrument designates the child after whom a Walter Subtrust is named as the "primary beneficiary" of that particular trust, and each "primary beneficiary" and his or her spouse is the beneficiary of the Walter Subtrust named after him or her during his or her lifetime. Unlike with the 2001 Subtrusts, however, each "primary

beneficiary" has a limited power of appointment that allows for the distribution of the trust corpus only to a descendant of Decedent or for a charitable purpose. The Walter Trust was divided into the Walter Subtrusts in 2009.[2]

At his death, Decedent owned residences in Denver, Vail, and Durango, Colorado, and Rancho Santa Fe, California. Decedent also owned vacant lots in Crosby, Texas, and Silesia, Montana.

The 2001 Trust became irrevocable upon Decedent's death. At the time of Decedent's death, the 2001 Trust owned 100 percent of Club Inc. and 45.25 percent of Duncan Mountain, Inc. The 2001 Trust also had some indirect ownership interest in DSC, DML, and Club LLC.

The Estate sold its marketable securities for approximately $2 million and received a $3.2 million distribution from Club Inc. NTC, however, estimated that the Estate's Federal estate tax liability would be approximately $11.1 million and determined that the 2001 Trust also needed to retain a cash reserve to satisfy the Estate's other obligations (e.g., ongoing administration expenses and amounts Decedent owed to his former spouse under a divorce decree).

To raise the necessary funds, Vincent Jr. and NTC decided to borrow money. They decided the 2001 Trust needed a 15-year term

_____

[2]For the sake of simplicity, we hereafter refer to the Walter Subtrusts as the Walter Trust and the 2001 Subtrusts as the 2001 Trust.

on the loan because the volatility of oil and gas prices made income from the oil and gas businesses difficult to predict. They accordingly asked the Northern Trust Corporation's banking department what the prevailing interest rate for a 15-year bullet loan (market rate) was and were quoted a rate of 6.7 percent.

In October 2006 Vincent Jr. and NTC (as co-trustees of both the 2001 Trust and the Walter Trust) executed a secured promissory note (the note) reflecting a $6,475,515.97 loan from the Walter Trust to the 2001 Trust. The loan called for interest at a rate of 6.7 percent per annum, compounded annually, with all interest and principal payable on October 1, 2021 (i.e., in 15 years). The note expressly prohibited the prepayment of interest and principal. When the loan was made, the long-term applicable Federal rate was 5.02 percent and the prime rate of interest was 8.25 percent.

The Estate applied for--and ultimately received--an extension of time to file its Federal estate tax return (extension request). The Estate included an $11,075,515 payment of its estimated Federal estate tax with the extension request.[3]

In April 2007 the Estate timely filed its Federal estate tax return. The value of the assets of the 2001 Trust was included in the value of Decedent's gross estate. The Estate claimed a

---

[3]The record does not explain how the proceeds of the loan were transferred to the Estate.

$10,653,826 deduction for the interest owed to the Walter Trust (interest expense) and a $750,000 deduction for estate settlement services paid to Vincent Jr. and NTC as co-trustees of the 2001 Trust. The Estate reported a Federal estate tax liability of $8,283,410, which was $2,792,105 less than the amount the Estate paid with its extension request. The Government refunded that difference to the Estate.

The Estate's properties in California, Texas and Montana were distributed to the 2001 Trust in October 2007, October 2008 and June 2010, respectively.

In December 2009 the Internal Revenue Service issued the Estate the deficiency notice determining that the Estate's interest expense was not deductible. The Estate filed a timely petition in response to the notice.

The Estate later filed an amended petition seeking to decrease the gross estate by $28,693 and to deduct $1,168,815.31 in expenses not claimed on the Estate's return. Respondent has conceded that of these expenses, the Estate is entitled to deduct specified amounts for funeral expenses, expenses related to Decedent's Denver property, probate filing fees, death certificate costs and fees paid to the Ryder Scott Company. The Estate has conceded that it is not entitled to deduct the cost of storing Decedent's personal property.

## OPINION

We are asked to decide whether the Estate may deduct the interest on the loan from the Walter Trust to the 2001 Trust. We must also decide whether the Estate may reduce the gross estate and whether the Estate may deduct expenses that were not claimed on its Federal estate tax return. We first address the burden of proof.

## I. Burden of Proof

The Commissioner's determinations are generally presumed correct, and the taxpayer bears the burden of proving that the Commissioner's determinations are erroneous. Rule 142(a);[4] Welch v. Helvering, 290 U.S. 111, 115 (1933). The Estate does not argue that the burden of proof shifted to respondent under section 7491(a). We therefore find that the burden of proof remains with the Estate.

## II. Interest Expense

We now turn to whether the Estate may deduct the interest on the loan from the Walter Trust as an administration expense under section 2053. The value of a decedent's taxable estate is determined by deducting from the value of the gross estate certain amounts including administration expenses allowable by

---

[4]All Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the date of Decedent's death, unless otherwise indicated.

the laws of the jurisdiction where the estate is administered. Sec. 2053(a)(2). Expenses incurred in administering non-probate property are generally deductible to the same extent as they would be under section 2053(a). Sec. 2053(b).

Respondent argues that the Estate is not entitled to deduct its interest expense because the loan was not a bona fide debt, the loan was not actually and reasonably necessary to the administration of the Estate, and the amount of the interest expense is not ascertainable with reasonable certainty.[5] We now consider each of these arguments in turn.

A.  Whether the Loan Was a Bona Fide Debt

An estate administration expense deduction for any indebtedness is limited to the extent that the indebtedness was contracted bona fide and for adequate and full consideration in money or money's worth. Sec. 2053(c)(1)(A).

Respondent's argument that the loan is not bona fide is based upon his analysis of 15 factors collectively taken from prior cases. See Estate of Rosen v. Commissioner, T.C. Memo. 2006-115; Estate of Graegin v. Commissioner, T.C. Memo. 1988-477.

---

[5]The Estate may deduct the 2001 Trust's interest expense (if the requirements of sec. 2053(a) are met) because the value of the 2001 Trust's assets was included in the gross estate. See sec. 2053(b); cf. Estate of Lasarzig v. Commissioner, T.C. Memo. 1999-307, (denying an estate an interest expense deduction because that nexus did not exist). In Estate of Lasarzig, the borrower was not the QTIP trust that was the residual beneficiary of the estate but rather the personal family trusts established by the beneficiaries of that QTIP trust.

Respondent contends that the balance of these factors weighs against finding the loan to be genuine indebtedness.

The factors taken from Estate of Rosen are irrelevant to the present case because they were used to decide whether a purported loan should be classified as equity rather than debt. Here, the Walter Trust and the 2001 Trust are not related in a way in which one can be considered the owner of the other. The loan therefore cannot be equity even if it is not bona fide.

While the factors taken from Estate of Graegin may provide helpful guidance, they are not exclusive, and no single factor is determinative. See Patrick v. Commissioner, T.C. Memo. 1998-30, affd. without published opinion 181 F.3d 103 (6th Cir. 1999). The factors are simply objective criteria helpful to the Court in analyzing all relevant facts and circumstances. Id. The ultimate questions are whether there was a genuine intention to create a debt with a reasonable expectation of repayment and whether that intention fits the economic reality of creating a debtor-creditor relationship. Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973).

Respondent contends that there is no objective indication that the Walter Trust intended to create a genuine debt and that the 2001 Trust intended to repay the loan. Respondent argues that the loan has no economic consequence because the borrower and creditor trusts are identical, having the same trustees and

beneficiaries. Respondent apparently sees the two trusts as a single trust, with the co-trustees free to shuffle money between these "trusts" as they please. Respondent argues that the Walter Trust has no reason to demand repayment because the detriment to it would be offset by the gain to the 2001 Trust. Respondent's arguments fail because they ignore Federal tax law and State law.

Vincent Jr. and NTC were compelled to direct the 2001 Trust to repay the Walter Trust because Illinois State law requires a trustee of two distinct trusts to maintain the trusts' individuality. For example, a trustee may not commingle two trusts' assets even when the trusts' beneficiaries are identical: "'That the trustees were or are the same, or that the corpus of each fund finally is to be paid to the same person, can make no difference. Each trust must stand alone, <u>otherwise losses legitimately to be borne, with corresponding loss of income by one, could be imposed in part upon the other</u>.'" <u>Harris Trust & Sav. Bank v. Wanner</u>, 61 N.E.2d 860, 865 (Ill. App. Ct. 1945) (quoting <u>Moore v. McKenzie</u>, 92 A. 296, 298 (Me. 1914) (emphasis added)). Thus, Vincent Jr. and NTC could not simply ignore the 2001 Trust's loan obligations because nonpayment of the loan would improperly impose a loss on the Walter Trust and thereby effectively shift assets to the 2001 Trust.

Furthermore, there is no basis in Federal tax law for treating the 2001 Trust and the Walter Trust as a single trust.

The only authorities that allow consolidation of multiple trusts are an income tax statute and a regulation addressing trusts with the same or substantially the same grantor.[6]  See sec. 643(f); sec. 1.641(a)-0(c), Income Tax Regs.  Neither the statute nor the regulation is applicable here because this is an estate tax case and the trusts do not share a common grantor.

    B.  <u>Whether the Loan Was Actually and Reasonably Necessary</u>

The amount of deductible administration expenses is limited to those expenses which are actually and necessarily incurred in the administration of the estate.  <u>Estate of Todd v. Commissioner</u>, 57 T.C. 288, 296 (1971); sec. 20.2053-3(a), Estate Tax Regs.

Respondent argues that the loan was not actually and reasonably necessary because (1) the 2001 Trust could have instead sold illiquid assets (e.g., a portion of its interest in Club LLC) to the Walter Trust and (2) the terms of the loan were unreasonable.

---

[6]We are aware that courts have treated multiple trusts as a single trust where the "trusts" were actually administered as one trust.  See <u>Sence v. United States</u>, 184 Ct. Cl. 67, 394 F.2d 842 (1968); <u>Boyce v. United States</u>, 190 F. Supp. 950 (W.D. La. 1961).  Respondent does not allege and the record does not suggest, however, that Vincent Jr. and NTC administered the 2001 Trust and Walter Trust as a single trust.  Furthermore, the "trusts" in those cases also had common grantors.

### 1. Whether the Estate Could Have Met Its Obligations By Selling Illiquid Assets to the Walter Trust

Expenses incurred to prevent financial loss resulting from a forced sale of an estate's assets to pay estate taxes are deductible administration expenses. Estate of Graegin v. Commissioner, supra; see also Estate of Todd v. Commissioner, supra.

The Estate claims it needed to borrow money because it could not have otherwise met its obligations without selling illiquid assets at reduced prices. The Estate estimated its Federal estate tax liability to be $11.1 million but had liquid assets of only $5.2 million at the time the loan was made.

Respondent does not contest that the Estate had insufficient liquid assets and that a forced sale of illiquid assets to a third party would have required a discount. Respondent instead argues that the 2001 Trust did not need to borrow money because it could have sold assets to the Walter Trust at full fair market value. Respondent argues that where the beneficiary of an estate was also the majority partner of a partnership owned by the estate, we found a loan from the estate to the partnership unnecessary because the estate could have redeemed its illiquid partnership interest in exchange for marketable securities held by the partnership. See Estate of Black v. Commissioner, 133 T.C. 340 (2009).

There, Mrs. Black's estate borrowed from the family limited partnership that it substantially owned. The income and distribution history of the partnership indicated that future distributions would be insufficient to allow the estate to repay the loan. Because the loan could not be repaid without selling stock owned by the partnership (and attributable to the estate's partnership interest), the Court held the loan was unnecessary. We also noted that because the estate's beneficiary was also the partnership's majority partner, he was on both sides of the transaction and effectively paying interest to himself. As a result, those payments had no effect on his net worth aside from the net tax savings.

We find this is of no moment here. Respondent misinterprets our holding in Estate of Black. We did not hold that the loan was unnecessary because the estate could have sold stock. We held the loan was unnecessary because the estate would have had to sell the stock under any circumstance. The sale of the stock was inevitable, and the estate therefore could not have entered into the loan for the purpose of avoiding that sale.

Furthermore, respondent's conclusion is incorrect that the 2001 Trust could have sold assets to the Walter Trust at fair market value. If other prospective purchasers had insisted on a discount, Vincent Jr. and NTC (as trustees of the Walter Trust) would have been required to do the same. Under Illinois State

law, Vincent Jr. and the NTC could not have directed the Walter Trust to purchase the 2001 Trust's illiquid assets at an unreduced price because they would have improperly shifted the value of the discount from the Walter Trust to the 2001 Trust.

2. Whether the Terms of the Loan Were Reasonable

Respondent argues that the loan should have carried a shorter term and a lower interest rate.

a. Whether the 15-Year Term Was Necessary

Respondent acknowledges that this Court has generally declined to second guess the judgments of a fiduciary acting in the best interests of the estate. McKee v. Commissioner, T.C. Memo. 1996-362; Estate of Sturgis v. Commissioner, T.C. Memo. 1987-415. Respondent, however, argues that we did not permit an estate to deduct its interest expenses beyond the first 15.5 months of a 10-year loan when we found the estate could repay the loan at that time. Estate of Gilman v. Commissioner, T.C. Memo. 2004-286. Respondent contends that, within 3 years after the Estate entered into the loan, it had generated cash in excess of $16.4 million that it could have used to repay the loan. Respondent argues that the Estate's interest deduction should be limited to three years to reflect the Estate's reasonable ability to have repaid the loan by the end of that period.

We did not, as respondent apparently suggests, second guess the Gilman estate's co-executors in Estate of Gilman. There, an

estate owned stock of a holding company and acquired $143 million in promissory notes in a subsequent tax-free reorganization of the holding company.  To pay its Federal estate tax, the estate obtained a 10-year, $38 million loan from a bank.  Because the notes the estate held were due approximately 15.5 months later and there was no indication that the notes' obligors would fail to repay, there was no question that the estate could have fully paid its taxes and administration expenses from the repayment of the notes.  We therefore held that the estate did not need to borrow funds past the date the notes were to be repaid and limited the estate's interest expense deduction accordingly.

Here, unlike the co-executors in Estate of Gilman, Vincent Jr. and NTC were not reasonably certain that the 2001 Trust would have enough money to fully pay the Estate's Federal estate tax and administration expenses within three years (the period to which respondent proposes to limit the Estate's interest expense deduction).  To the contrary, Club Inc.'s accountant, Gregory Smith, credibly testified that the volatility in the price of oil and gas made future income difficult to predict.  Although the Estate may have  generated enough cash to repay the loan after three years,[7] we will not use the benefit of hindsight to second

---

[7]The Estate disputes respondent's contention that the 2001 Trust had generated over $16.4 million in cash by the end of 2009.  We find there was no indication at the time the loan was entered into that the 2001 Trust was expected to generate

(continued...)

guess Vincent Jr.'s and NTC's judgments when they were acting in the best interest of the Estate.

### b. Whether the Interest Rate Was Excessive

Respondent acknowledges that the interest rate here is less than the prime rate and that we have previously approved a loan based on the prime rate. See Estate of Graegin v. Commissioner, T.C. Memo. 1988-477. Respondent, however, seeks to distinguish this case by arguing that the interest rate in Estate of Graegin had an actual economic consequence to the estate because the corporate lender included shareholders outside the Graegin family. Respondent suggests that the co-trustees here should have used the long-term applicable Federal rate instead and that their selection of a higher interest rate has no economic consequence because the Walter Trust's interest income offsets the 2001 Trust's interest expense. Respondent argues that the loan's interest rate was not reasonable because there were no negotiations between the trusts.

We disagree that the co-trustees should have used the long-term applicable Federal rate because that rate does not represent the 2001 Trust's cost of borrowing. Interest rates are generally determined according to the debtor's rather than the creditor's characteristics. United States v. Camino Real Landscape Maint.

---

⁷(...continued)
sufficient cash to repay the loan within three years, and consequently, we need not resolve this dispute.

Contractors, Inc., 818 F.2d 1503, 1506 (9th Cir. 1987). The long-term applicable Federal rate is thus inappropriate because it is based on the yield on Government obligations. See sec. 1274(d)(1)(C)(i) and (ii). It therefore reflects the Government's cost of borrowing, which is low because Government obligations are low-risk investments. See United States v. Camino Real Landscape Maint. Contractors, Inc., supra at 1506. Using the long-term applicable Federal rate consequently would have been unfair to the Walter Trust.

We reject respondent's argument that a higher interest rate is economically inconsequential simply because it is premised upon his treatment of the Walter Trust and the 2001 Trust as a single trust. Again, there is no basis in Federal tax law or State law for doing so.

We find perplexing respondent's argument that the interest rate was unreasonable since no negotiations had taken place. Vincent Jr. and NTC asked the Northern Trust Corporation's banking department for the market rate of interest. We do not understand why or how Vincent Jr. and NTC, as co-trustees of both trusts, would subsequently sit down and negotiate between themselves a different figure. Formal negotiations would have amounted to nothing more than playacting, and to impose such a requirement on the co-trustees would be absurd. Vincent Jr. and NTC made a good-faith effort to select an interest rate that was

fair to both trusts. Once more, there is no reason to second guess their judgment.

     C.  <u>Whether the Amount of the Interest Expense Is Ascertainable With Reasonable Certainty</u>

An item may be deducted even if its exact amount is not then known as long as it is ascertainable with reasonable certainty and will be paid. Sec. 20.2053-1(b)(3), Estate Tax Regs. A deduction may not be claimed based upon a vague or uncertain estimate. <u>Id.</u>

Respondent argues that the amount of the interest expense is uncertain because the 2001 Trust could choose to make an early repayment of the loan. An early repayment would reduce the total amount of interest. Respondent acknowledges that a clause in the note prohibits prepayment. Respondent argues, nonetheless, that because the same trustees and beneficiaries stand on both sides of the transaction, the 2001 Trust's reduced interest expense cancels out the Walter Trust's lost interest income and there is thus no economic interest to enforce the prepayment prohibition clause.

We disagree with respondent and find prepayment would definitely not occur. As discussed above, the Walter Trust and the 2001 Trust are distinct trusts to be administered separately. If interest rates rose to the point where the Walter Trust would benefit from early repayment, Vincent Jr. and NTC would not

direct an early repayment because this would harm the 2001 Trust. The 2001 Trust would be disadvantaged in this situation because it would be better off reinvesting the money used to prepay the loan. If interest rates did not rise, Vincent Jr. and NTC would not allow prepayment because that would reduce the Walter Trust's interest income.

D. Conclusion

We find that the loan was a bona fide debt, the interest expense was actually and necessarily incurred in the administration of the estate, and the amount of interest was ascertainable with reasonable certainty. We therefore hold that the Estate is entitled to deduct the interest expense as an estate administration expense under section 2053.

III. Decrease in Gross Estate

We now turn to whether the Estate may decrease the gross estate. In its amended petition, the Estate claimed a $28,693 decrease in Decedent's gross estate. The Estate did not raise the issue at trial or on brief. We therefore deem the Estate to have conceded or abandoned this issue.

IV. Deductions Not Claimed on the Estate's Return

We now turn to whether the Estate may deduct expenses not claimed on its Federal estate tax return.

A.  Additional Attorney's Fees

The Estate claimed $247,611.96 in additional attorney's fees.  Respondent has conceded that the Estate is entitled to deduct reasonable attorney's fees computed under Rule 155.  The Estate argues that the reasonableness of the attorney's fees is a legal issue that must be decided before Rule 155 computations.  We agree.

New issues generally may not be raised in a Rule 155 computation.  Rule 155(c); Harris v. Commissioner, 99 T.C. 121, 123 (1992), affd. 16 F.3d 75 (5th Cir. 1994).  Issues considered under Rule 155 are limited to purely mathematically generated computational items.  Harris v. Commissioner, supra at 124. Determining what amount of attorney's fees is reasonable requires more than mere mathematical computation and therefore cannot be done under Rule 155.

Respondent has not asserted that the $247,611.96 in additional attorney's fees claimed by the Estate is unreasonable. Respondent is therefore deemed to have conceded this issue.

B.  Real Estate Expenses

Expenses incurred in preserving and distributing the estate are deductible, including the cost of storing or maintaining property of the estate if it is impossible to immediately distribute to the beneficiaries.  Sec. 20.2053-3(d)(1), Estate Tax Regs.

Respondent argues that the Estate has failed to explain why it could not have distributed its real properties to the 2001 Trust before filing its return. If the Estate could have made those distributions, then these real estate expenses (incurred after the return filing) were unnecessary.

The Estate claims that an executor customarily delays distributing the property of the estate until the estate tax liability is finally determined because the executor may become personally liable if the estate's assets are insufficient to pay the taxes. The Estate contends that the present controversy thus prevents the immediate distribution of the Estate's real property. The Estate contends that its co-executors can distribute that property once this litigation concludes and they no longer face the possibility of personal liability.

The record belies the Estate's contention because it shows that the Estate has already distributed some of the properties to the 2001 Trust. The Estate has consequently failed to provide a valid explanation of why it needed to retain the real properties and has thus has not shown that the real estate expenses were necessary. They therefore cannot be allowed.

C. Debts of the Decedent

The value of the gross estate is determined by deducting certain amounts including the amount of claims against the estate allowable by the laws of the jurisdiction under which the estate

is being administered. Sec. 2053(a)(3). Only claims representing enforceable, personal obligations of the decedent existing on the date of the decedent's death are deductible as claims against the estate. Sec. 20.2053-4, Estate Tax Regs.

The Estate claimed deductions for a $38,583.90 payment to Medicare and a $60 payment to Quest Diagnostics Lab for services provided between November and December 2006. The Estate claims these payments were in satisfaction of debts the Decedent owed at the time of his death, but it offered no evidence to support that claim. Furthermore, the debt to Quest Diagnostics Lab could not have belonged to Decedent because the services were provided almost a year after his death. The Estate has therefore failed to meet its burden of proof.

D. Trust Management Fees

Expenses incurred in administering non-probate property are deductible to the same extent as if incurred in administering probate property. Sec. 2053(b). The deduction is limited, however, to expenses occasioned by the decedent's death and incurred in settling the decedent's interest in the property or vesting good title to the property in the beneficiaries. Sec. 20.2053-8(b), Estate Tax Regs. Expenses incurred on behalf of the transferees are not deductible. Id.

The Estate argues that the monthly trust management fees were expenses occasioned by Decedent's death because they were

compensation for the services an executor would perform had all the assets been included in Decedent's probate estate. Respondent argues that the trust management fees compensated NTC and Vincent Jr. for managing the 2001 Trust's assets rather than settling or administering the Estate.

We agree with respondent. The trust management fees could not have been compensation for services that an executor would perform because they will continue to be paid after the Estate has been closed. According to Marlene Hersh, a senior asset manager at NTC and a former administrator in NTC's estate settlement services department, the compensation for those services is the estate settlement fees, which the Estate already deducted on its return. The Estate is thus not entitled to deduct the trust management fees.

E. Miscellaneous Expenses

The Estate claims a deduction for the payment of a $300 bank fee for opening Decedent's safety deposit box. The record establishes that the Estate did in fact make this payment, and respondent has offered no reason we should find this expense unrelated to the administration of the Estate. The Estate is thus entitled to deduct this expense.

The Estate claims deductions for a $989.24 payment for excess liability coverage and a $1,656.54 payment for auto insurance. The Estate generally asserts that all of its

miscellaneous administration expenses were paid after proper review by its co-executors.  The co-executors' approval of expenses does not, however, establish their deductibility.  As a matter of fact, the miscellaneous administration expenses claimed by the Estate include $14,064 in storage expenses, which the Estate has since conceded to be nondeductible.  Having failed to offer any specific explanation and proof that these two insurance expenses were connected to the administration of the Estate, the Estate is not entitled to deduct these expenses.

V.  Conclusion

The Estate's interest expense is deductible because the loan was genuine indebtedness, the interest expense was actually and necessarily incurred in the administration of the Estate, and the amount of interest was ascertainable with reasonable certainty.  Further, the Estate may not decrease the gross estate.  In addition, the Estate is entitled to deduct its additional attorney's fees and a $300 bank fee.

In reaching our holdings, we have considered all arguments made, and to the extent not mentioned, we consider them irrelevant, moot, or without merit.

To reflect the foregoing,

Decision will be entered under Rule 155.